**Joseph Wayne HARDEN,**
**Movant–Appellant,**

v.

**STATE of Missouri, Respondent–**
**Respondent.**

**No. SD 32315.**

Missouri Court of Appeals,
Southern District,
Division Two.

Nov. 12, 2013.

Timothy Forneris, Assistant Public Defender, St. Louis, MO, attorney for movant.

Chris Koster, Attorney General, and Daniel N. McPherson, Assistant Attorney

General, Jefferson City, MO, attorneys for respondent.

GARY W. LYNCH, Judge.

Joseph Wayne Harden ("Movant") appeals the denial of his Rule 29.15[1] post-conviction motion alleging ineffective assistance of counsel. Movant contends that counsel was ineffective, first, for failing to file a motion to dismiss the charges against him or to dismiss the State's notice of death based on prosecutorial vindictiveness and, second, for failing to request that the trial court strike the testimony of Donald Booth. Finding no clear error in the motion court's judgment as claimed, we affirm.

### Factual and Procedural Background

On July 7, 2008, Al Harper ("Al") paid Movant $70 to drive to Dyersburg, Tennessee, to pick up Danny Singletary ("Danny") and bring him to Al's house in Paragould, Arkansas, where Al had invited Danny to stay for a week or two. Movant was married to Danny's sister-in-law. Once back at Al's house, the trio made sandwiches, and Danny saw Movant take a three-inch knife with a black handle from his pocket. Movant then returned to his home in Kennett, Missouri.

Later that same night, Movant again went to Al's house in Paragould, and the three men eventually headed back to Dyersburg in order to "get more clothes and drugs." Danny was driving. All three men had been drinking and using crack cocaine.

While driving through Hayti, Missouri, around 3:30 a.m. on July 8, Danny ran the car off the road while attempting to pass a semi-truck. Despite blowing out both tires on the driver's side of the car, Danny managed to get the vehicle back on the road before he was pulled over by Officer Jones, a Hayti police officer. Danny was arrested for driving while intoxicated, and both Al and Movant were patted down; Officer Jones found a pocket knife on Movant, but he felt the knife did not pose a threat and did not seize it. Officer Jones noted that Movant was wearing a white sleeveless t-shirt, black jeans, a red baseball cap, and boots. Al was wearing a camouflage-patterned hat, a white t-shirt with sleeves, blue jeans, and sandals. Both Movant and Al were released by Officer Jones around 4:00 a.m.

After being released, Movant and Al walked to a nearby bank. Al made two ATM withdrawals, one for $20 at 4:23 a.m. and one for $200 at 4:25 a.m.; surveillance video captured Al making the withdrawals, giving some of the cash to Movant, and putting the remaining cash in his wallet.

At about 5:45 a.m., Movant called a friend from a pay phone at nearby Brown's Grocery and asked him to pick up Al and Movant; around this same time, a motorist driving past Brown's Grocery saw two men, one on the phone and the other sitting down. Movant's friend was unable to pick up Al and Movant, as requested.

Between 7:00 a.m. and 7:30 a.m., two passing motorists saw a shirtless man wearing jeans walking along the highway near a farm shop that was approximately 250 to 300 yards from Brown's Grocery. One of the motorists observed that the man was "coming out from" the farm shop. The other motorist, who was the owner of the farm shop, noticed approximately inch-tall letters tattooed across the upper part of the man's back; Movant has his name, "Harden," tattooed in large letters across his upper back. The owner of the farm shop also noted that the man was carrying something in one of his hands.

1. All rule references are to Missouri Court Rules (2013).

When the owner arrived at the farm shop, he walked behind the building and found Al lying on the ground, face up and appearing to be dead. A white t-shirt covered his head and face. The shop owner immediately called the sheriff's department. The responding deputy noticed blood and drag marks on the west side of the shop, which could be seen from the road. The drag marks indicated that someone had been dragged from the west side of the shop to behind the shop, which could not be seen from the road.

Al's head and face had been crushed with a blunt object and, in a field behind the shop, police recovered a large concrete block with blood on it. Forensic testing later showed that the blood stains on the block were consistent with Al's DNA. Al's primary cause of death was massive blunt trauma to the head. Additionally, Al's neck and throat had been slashed multiple times, and he had thirty-six stab wounds to the chest. Al's throat had been cut while he was still alive, but the stab wounds on his chest were inflicted post-mortem. Al had defensive wounds on his wrist. Al's autopsy revealed that Al was "grossly intoxicated and potentially stuperous" at the time he was killed.

Sometime after 7:30 a.m., Movant was seen in a neighborhood located approximately one-half mile from the farm shop, where a woman and her son were attempting to load an abandoned television into their truck. Movant helped load the television into the truck and then unload the television at the woman's home. While at the woman's home, the son, Donald Booth, saw Movant throw a t-shirt and hat underneath some steps on an adjacent vacant lot. Police later recovered a white sleeveless t-shirt and a camouflage-patterned baseball cap from that lot. Forensic testing later showed that a mixture of DNA

consistent with Movant and Al was present on the t-shirt, and DNA consistent with Al was found inside the hat.

After unloading the television, the woman drove Movant to Kennett and dropped him off at a Wal–Mart. Movant entered the store, shirtless, at 8:25 a.m. When a Wal–Mart employee asked Movant why he was not wearing a shirt, Movant stated that he had been soaked in gasoline while working on his vehicle. Movant purchased a pair of pants, a belt, a shirt, and a pair of shoes, and he asked the employee to throw away his old jeans. Police later recovered the jeans and found blood stains on them; the blood stains were consistent with Al's DNA. Both Movant's and Al's DNA was found on the inside of the waistband of the jeans.

Police officers found Al's wallet inside a trash can in the parking lot of Brown's Grocery. Inside the wallet were pictures and a debit card, but no cash. There were no fingerprints or DNA on the wallet. Police also found a knife near the edge of a bean field between Brown's Grocery and the farm shop where Al's body was found. The knife was identified at trial as the same knife Danny saw Movant take out at Al's house the night before the murder. Blood on the blade of the knife was consistent with Al's DNA.

Movant was charged via amended information as a prior and persistent felony offender with one count of first-degree murder, see § 565.020, one count of first-degree robbery, see § 569.020, and four counts of armed criminal action, see § 571.015.[2] Two of the counts of armed criminal action alleged that Movant used a concrete block to commit the underlying felonies, while the remaining two counts alleged that Movant used a knife to com-

---

2. All statutory references are to RSMo 2000.

mit them. After his preliminary hearing on September 8, 2008, the State filed a Notice of Intent to Seek the Death Penalty on September 23, 2008. Nearly a year later, on September 1, 2009, Movant filed a document with the trial court indicating his waiver of the right to a jury trial in exchange for the State's agreement not to seek the death penalty. That same day, Judge Fred Copeland of the Pemiscot County Circuit Court questioned Movant about the voluntariness of the waiver; Movant stated that he "freely and voluntarily" decided to waive his right to a trial by jury and that he "trust[ed]" the trial court, specifically Judge Copeland. The trial court then accepted Movant's waiver.

Movant testified at trial, denying that he robbed Al, killed him, or had any weapons that night. Movant admitted being with Al at the ATM when Al made the two withdrawals and testified that Al had given him about $75 for picking up Danny in Dyersburg. Movant testified that, as he and Al were walking away from the bank, Al fell down face-first onto some railroad tracks and rolled into a ditch. Movant pulled Al out of the ditch, getting Al's blood on his pants. Movant claimed he gave Al his shirt so Al could wipe his face. According to Movant, they then separated, and Movant left to help the woman and her son move the television in the hope that they would give him and Al a ride to Kennett.

Movant was convicted of first-degree murder, first-degree robbery, and the two counts of armed criminal action relating to the concrete block; he was acquitted of the two counts of armed criminal action relating to the knife. The trial court sentenced Movant to life imprisonment without probation or parole plus ten years. This Court affirmed his convictions and sentence by unpublished memorandum on June 17, 2011.

Movant timely filed a *pro se* Rule 29.15 motion for post-conviction relief. Counsel for Movant was appointed and timely filed an amended motion alleging that Movant's trial counsels were ineffective for (1) failing to file a motion to dismiss the charges and/or the notice of intent to seek the death penalty on the ground of prosecutorial vindictiveness and (2) failing to request that the trial court strike the testimony of Donald Booth. An evidentiary hearing took place, during which Movant presented evidence via deposition. The motion court entered judgment denying Movant's post-conviction motion. This appeal followed. Any additional necessary facts will be set out in the discussion *infra*.

### Standard of Review

This Court's review of the denial of a Rule 29.15 motion for post-conviction relief is limited to determining whether the motion court's findings of fact and conclusions of law are clearly erroneous. Rule 29.15(k); *Williams v. State*, 168 S.W.3d 433, 439 (Mo. banc 2005). Such "[f]indings and conclusions are clearly erroneous only if a full review of the record definitely and firmly reveals that a mistake was made." *Morrow v. State*, 21 S.W.3d 819, 822 (Mo. banc 2000). It is incumbent upon the movant in a post-conviction motion to prove his or her claims for relief by a preponderance of the evidence. Rule 29.15(i). This Court presumes that the motion court's findings and conclusions are correct, *Wilson v. State*, 813 S.W.2d 833, 835 (Mo. banc 1991), and we will uphold those findings and conclusions if they are sustainable on any grounds. *Swallow v. State*, 398 S.W.3d 1, 3 (Mo. banc 2013). Finally, we defer to the motion court's determinations of credibility, and the motion court is free to believe all, part, or none of the witnesses' testimony. *Zink v. State*, 278 S.W.3d 170, 192 (Mo. banc 2009).

## Discussion

■ In order to prevail on a post-conviction motion alleging ineffective assistance of counsel, a movant must overcome a strong presumption of competence and demonstrate, by a preponderance of the evidence, that (1) counsel did not exercise the customary skill and diligence that a reasonably competent attorney would have exercised under the same or similar circumstances, and (2) counsel's failure to exercise such skill and diligence prejudiced the movant in some way. *Strickland v. Washington,* 466 U.S. 668, 687, 689, 104 S.Ct. 2052, 2053, 80 L.Ed.2d 674 (1984); *Sanders v. State,* 738 S.W.2d 856, 857 (Mo. banc 1987). To satisfy the performance prong, a movant "must overcome the presumptions that any challenged action was sound trial strategy and that counsel rendered adequate assistance and made all significant decisions in the exercise of professional judgment." *State v. Simmons,* 955 S.W.2d 729, 746 (Mo. banc 1997). In order to demonstrate the requisite prejudice, a movant must show that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. *Strickland* defines "a reasonable probability" as "a probability sufficient to undermine confidence in the outcome." *Id.* In reviewing such claims, we are not required to examine both prongs; if a movant fails to satisfy the performance prong, we need not consider the prejudice prong, and vice versa. *Strickland,* 466 U.S. at 697, 104 S.Ct. 2052; *Sanders,* 738 S.W.2d at 857.

### No Prosecutorial Vindictiveness

■ In his first point, Movant claims that his trial counsel should have filed a motion to dismiss either the charges against him or the State's notice of its intent to seek the death penalty because the State's decision to seek the death penalty was based on prosecutorial vindictiveness. Movant claims in his point that "After [Movant] chose to have a preliminary hearing and wanted to go to trial on the charges, *rather than to accept any plea offer from the State,* the prosecutor filed its notice of intent to seek the death penalty." (Emphasis added.) On the record before the motion court, no such vindictiveness occurred.

■ There are two ways to prove prosecutorial vindictiveness: (1) "if a realistic likelihood of vindictiveness is found, a presumption is erected in [the] defendant's favor[,] which the prosecutor must rebut"; or (2) "a defendant can make a case for prosecutorial vindictiveness without the aid of the ... presumption if he can prove, through objective evidence[,] that the sole purpose of the State's action was to penalize him for exercising some right." *State v. Potts,* 181 S.W.3d 228, 233–34 (Mo.App.2005) (citing *United States v. Goodwin,* 457 U.S. 368, 380 n. 4, 384, 102 S.Ct. 2485, 73 L.Ed.2d 74 (1982)). "Reasonable likelihood" is determined by weighing two factors: (1) the prosecutor's stake in deterring the exercise of the right being asserted; and (2) the prosecutor's actual conduct. *State v. Cayson,* 747 S.W.2d 155, 158 (Mo.App.1987).

Movant's preliminary hearing took place September 8, 2008, after which he was bound over to circuit court. Shortly thereafter, on September 23, 2008, the State filed its Notice of Intent to Seek the Death Penalty. The State filed the Information on October 7, 2008, and Movant entered a plea of not guilty that same day. Movant's initial attorney, Brandon Sanchez, filed a Motion to Withdraw on October 15, 2008, and Movant's new counsels, Robert Wolfrum and Beth Davis–Kerry, entered appearances on Movant's behalf on November 6, 2008. According to Movant's

testimony at the evidentiary hearing in the motion court, it was Wolfrum who informed Movant of the State's offer of twenty years' incarceration in exchange for a guilty plea. There is no evidence in the record of any plea offer being made or any plea negotiations taking place *before* the State filed its Notice of Intent to Seek the Death Penalty on September 23, 2008.

While it can be argued that a prosecutor will always have some stake in deterring a defendant from asserting his or her right to trial by jury—e.g., lowering the risk of acquittal—the obstacle for Movant in the case at bar exists in the prosecutor's actual conduct. Movant's argument on this point claims that "the timing of the State's filing of its notice of death, combined with [Movant's] absolute refusal to plead, indicated that the State was penalizing [Movant] for insisting on a trial." In making this argument, Movant ignores the actual timing of events. Indeed, not only did the State file its notice of intent to seek the death penalty two weeks before filing the Information, but by Movant's own admission, he was unaware of any plea offer until after the notice of intent had been filed and his capital counsels entered their appearance. As such, it would have been impossible for the State to have filed the notice of intent to seek the death penalty solely to punish Movant for asserting his right to trial. Movant provides no other logical argument

as to how the State's action constituted prosecutorial vindictiveness.[3]

As Movant did not meet his burden of demonstrating prosecutorial misconduct, any motion to dismiss on that ground that trial counsel might have filed would have been denied. "We will not deem counsel to have been ineffective for failing to file a meritless motion[.]" *State v. Neal,* 849 S.W.2d 250, 258 (Mo.App.1993) (citing *State v. Hunter,* 840 S.W.2d 850, 870 (Mo. banc 1992); *State v. Twenter,* 818 S.W.2d 628, 643 (Mo. banc 1991)). Movant's first point is denied.

### Donald Booth's Testimony Admissible

 In his second point, Movant claims that trial counsel should have moved to strike Donald Booth's trial testimony, which differed from Booth's testimony at the preliminary hearing.[4] We disagree.

At Movant's preliminary hearing, Donald Booth testified that he was helping his mother load a television into a truck and that "a white guy" helped them. When asked if he had seen the man helping them go over to a porch on the adjacent lot, Booth replied, "I wasn't paying no attention." He later said that he saw a red handkerchief under the steps. At trial, however, Booth testified that he saw the man "[t]hrow the clothes down in the porch" and told police. On cross-examination, Booth acknowledged that his trial testimony differed from his testimony at

---

**3.** Movant also provides his own rationale for waiving his right to a jury trial—he testified that he waived his right in order to avoid the death penalty—as further evidence of prosecutorial vindictiveness, which amounts to circular reasoning and ignores the relevant factors at issue in raising the presumption. In essence, Movant claims that, because his personal motive for waiving his right to a jury trial was that the State intended to seek the death penalty, the State must have intended to seek the death penalty in order to get Movant to waive that right.

**4.** Although in the argument portion of this point Movant suggests that Booth's testimony was inadmissible because he lacked first-hand knowledge of whether Movant placed the shirt and hat under the steps, Movant's point relied on discusses only that Booth's testimony was inconsistent. "We do not consider arguments raised in the argument portion of [a] brief that were not encompassed in the points relied on." *State v. Irby,* 254 S.W.3d 181, 195 (Mo.App.2008).

the preliminary hearing. The trial court then asked Booth to clarify some of his statements, and Booth stated that he "saw somebody throw, just a wad in his hand and did that." When his mother left to drive Movant to Kennett, Booth went over to the adjacent lot and saw a "T-shirt and the hat, . . . and red, like a straw red, like handkerchief." Booth told the trial court that he told the police chief about what he saw. The trial court then acknowledged that Booth "gave conflicting testimony as to what he's testifying to today here [and] at the preliminary hearing and I'll note those portions that I've read into the record in attempting to impeach his testimony here today with his prior inconsistent statements." Both the State and Movant's trial counsel agreed to the trial court taking judicial notice of the applicable portions of the transcript, including all of Booth's preliminary hearing testimony.

"Conflicts between a witness's trial testimony and previous testimony or statements are for the trial court to reconcile in assessing credibility." *State v. Gray*, 230 S.W.3d 613, 620 (Mo.App.2007). That is, the inconsistencies between Booth's testimony at the preliminary hearing and at trial went to the weight of the evidence, not its admissibility. *See State v. Eiland*, 534 S.W.2d 814, 816 (Mo.App. 1976) ("Inconsistencies such as these affect the weight, not the admissibility or sufficiency, of the evidence. It is for the jury to determine whether the witness'[s] testimony at trial is credible in the light of the inconsistencies."). As such, any motion to strike Booth's testimony would have been denied. "We will not deem counsel to have been ineffective for failing to file a meritless motion or for failing to object to admissible evidence." *Neal*, 849 S.W.2d at 258 (citing *Hunter*, 840 S.W.2d at 870; *Twenter*, 818 S.W.2d at 643). Movant's second point is denied.

*Decision*

The motion court's judgment is affirmed.

JEFFREY W. BATES, P.J. and MARY W. SHEFFIELD, J., concur.