George W. Draper III, Judge
Terrance Anderson (hereinafter, "Movant") was convicted by a jury of two counts of first-degree murder in connection with the deaths of Stephen Rainwater (hereinafter, "Stephen") and Debbie Rainwater (hereinafter, "Debbie").[1] The circuit court adopted the jury's recommendations and sentenced Movant to serve a life sentence without the possibility of parole for Stephen's murder and sentenced him to death for Debbie's murder. This Court affirmed Movant's convictions.
This appeal concerns the motion court's judgment overruling Movant's Rule 29.15 motion after an evidentiary hearing. This Court has exclusive jurisdiction over this appeal because a death sentence was imposed. Mo. Const. art. V, sec. 10 ; see also Standing Order, June 16, 1988 (effective July 1, 1988). This Court affirms the motion court's judgment.
Factual and Procedural History[2]
In February 1996, Movant began dating Stephen and Debbie's daughter, Abbey. Abbey became pregnant with Movant's child and gave birth to a daughter in April *598 1997. Shortly thereafter, Movant assaulted Abbey on two separate occasions. On July 25, 1997, Abbey told her parents about the assaults and obtained an ex parte order of protection against Movant. Abbey informed Movant of the ex parte order of protection and told him custody and visitation of their daughter would be arranged through the court. Movant obtained a gun from a friend and went to the Rainwaters' home. After kicking in the front door, Movant shot and killed Debbie, who was on her knees begging for her life while holding Movant's daughter. Movant took his daughter from the home and confronted Stephen outside. Movant shot Stephen in the head while Movant held his daughter.
Prior to trial, the circuit court heard evidence regarding Movant's mental competency to stand trial. Dr. Dorothy Lewis (hereinafter, "Dr. Lewis") examined Movant and testified by deposition. Dr. Lewis stated Movant was extremely paranoid, delusional, and had signs of dissociation. Dr. Lewis testified Movant did not trust his attorneys because he was convinced he did not shoot Debbie; hence, Movant believed any work trial counsel performed concerning that charge consisted of a conspiracy to frame him. Dr. Lewis opined Movant lacked an appreciation of the meaning of the evidence against him and was unable to assist in his defense. The circuit court determined Movant was competent to proceed.
During the guilt phase, Movant presented testimony from a neurologist who opined Movant had neurological problems at the time of the murders because his frontal lobe and parietal lobe were not working properly, and he was depressed. Larry Woods (hereinafter, "Woods"), an investigator with the public defender's office, testified about Movant's troubling behavior when Woods attempted to interview him for public defender services shortly after the murders. Movant also presented deposition testimony from Dr. Lewis regarding his mental state at the time of the murders, which echoed her testimony regarding his competence. Dr. Lewis stated Movant told her it was "absolutely impossible" he shot Debbie. Dr. Lewis further stated Movant told her there were things that happened in his home and during his childhood he could not reveal. The jury found Movant guilty on both counts of first-degree murder.
In an attempt to mitigate punishment during the penalty phase, Movant presented testimony from five witnesses including Movant's sister and his stepfather, Robert Smith (hereinafter, "Smith"). Smith testified he raised Movant from the time he was ten months old and did not want Movant to know the identity of his biological father. Smith described coaching Movant's little league team and attending Movant's high school basketball games. Smith also testified about how Movant broke his leg when he was five years old after being struck by a car.
The jury recommended Movant receive a life sentence without the possibility of parole for Stephen's murder and a death sentence for Debbie's murder. The circuit court imposed the sentences the jury recommended.
Movant appealed. Appellate counsel raised nine claims of error, but did not include a claim requesting proportionality review. This Court affirmed the circuit court's judgment and conducted an independent proportionality review as mandated by section 565.035.3, RSMo 2000.[3] State v. Anderson , 79 S.W.3d 420 (Mo. banc 2002) (" Anderson I ").
*599 Movant sought post-conviction relief pursuant to Rule 29.15. The motion court overruled Movant's motion after an evidentiary hearing. This Court affirmed the motion court's judgment with respect to the guilt phase ineffective assistance of counsel claims. This Court reversed the judgment due to trial counsel's failure to strike during voir dire a juror who indicated he would vote for a death sentence unless the defense could convince him otherwise. This Court remanded the case so Movant could receive a new penalty phase trial for Debbie's murder. Anderson v. State , 196 S.W.3d 28 (Mo. banc 2006) (" Anderson II ").
During the penalty phase retrial in November 2008, Movant was represented by Sharon Turlington (hereinafter, "Turlington") and Beth Davis-Kerry (hereinafter, "Davis-Kerry" and, collectively, "trial counsel"). During one of the state's witnesses' testimony relaying how Debbie was shot, Movant stated to trial counsel the witness "was lying and I really remember what happened and you know it wasn't like that at all." Trial counsel spoke with Movant later that evening, and he reiterated he always remembered shooting Debbie.
Trial counsel intended to present testimony from Dr. William Holcomb (hereinafter, "Dr. Holcomb"), a forensic psychologist, regarding Movant's mental state, but chose not to do so after learning Movant remembered shooting Debbie. Instead, trial counsel presented testimony from Movant's high school classmates, teammates, and basketball coaches who testified about his nonviolent nature and how shocked they were upon hearing Movant committed the murders. Movant's mother, Linda, his stepsister, Deborah, and Smith testified about their home life and Movant's upbringing. Smith repeated his testimony from Anderson I , including how Smith did not discuss Movant's biological father because they "had a good family and a good relationship."
Movant testified after the circuit court advised him of his rights and offered Movant additional time to confer with trial counsel. Movant stated he chose to testify because he wanted everyone to know what happened the night of the murders because he owed it to the Rainwater family. Movant discussed the events leading up to the murders, including ex parte orders of protection Debbie obtained against Movant before his daughter was born and the one Abbey obtained prior to the murders. Movant presented a different version of events regarding the murders, which conflicted with other witnesses and some of the forensic evidence. Movant expressed remorse for the murders. After the penalty phase retrial, Movant was sentenced to death for Debbie's murder.
Movant appealed. Appellate counsel raised several claims of error, but failed to raise a claim requesting proportionality review. This Court affirmed the circuit court's judgment and conducted an independent proportionality review pursuant to section 565.035.3. State v. Anderson , 306 S.W.3d 529 (Mo. banc 2010) (" Anderson III "). After this Court issued its opinion, appellate counsel filed a motion for rehearing urging this Court to withdraw its opinion and allow further consideration of the proportionality issue in light of this Court's then-recent opinion in State v. Deck , 303 S.W.3d 527 (Mo. banc 2010). This Court overruled Movant's motion for rehearing.
Movant filed a subsequent motion for post-conviction relief, alleging several claims of ineffective assistance of trial and appellate counsel for their performance during the penalty phase retrial. The judge who presided over all of Movant's previous proceedings, overruled Movant's motion to recuse him for cause. Movant presented evidence from several witnesses, *600 including Woods, Turlington, Davis-Kerry, and additional deposition testimony from Dr. Lewis. The motion court overruled Movant's post-conviction relief motion.
Movant appealed, arguing inter alia , the judge should have recused himself because he relayed comments the jury foreperson stated to him after the first penalty phase trial explaining why the jury recommended a death sentence for Debbie's murder. The judge also distributed to the attorneys a copy of a 2004 New Yorker article regarding Dr. Lewis, stating the article showed she was a "frequent flyer" with the public defender system and was "not believable." This Court held these actions created an appearance of impropriety and required the judge to recuse himself. This Court reversed the motion court's judgment and remanded the case for further proceedings. Anderson v. State , 402 S.W.3d 86 (Mo. banc 2013) (" Anderson IV ").
A new judge was assigned to preside over the evidentiary hearing on remand. The motion court took judicial notice of the trial transcript from Anderson I , the transcripts and evidence from Anderson II and Anderson III , and the transcript from Anderson IV , along with other exhibits concerning witnesses who testified previously, but were unavailable for the current hearing. After hearing additional live testimony on Movant's behalf, the motion court issued findings of fact and conclusions of law, made credibility determinations, and denied Movant relief. Movant now appeals, raising ten claims of error.
Standard of Review
This Court reviews the denial of post-conviction relief to determine whether the motion court's findings of fact and conclusions of law are clearly erroneous. Rule 29.15(k). "A judgment is clearly erroneous when, in light of the entire record, the court is left with the definite and firm impression that a mistake has been made." Swallow v. State , 398 S.W.3d 1, 3 (Mo. banc 2013). The motion court's findings are presumed correct. Johnson v. State , 406 S.W.3d 892, 898 (Mo. banc 2013). "This Court defers to 'the motion court's superior opportunity to judge the credibility of witnesses.' " Barton v. State , 432 S.W.3d 741, 760 (Mo. banc 2014) (quoting State v. Twenter , 818 S.W.2d 628, 635 (Mo. banc 1991) ).
To be entitled to post-conviction relief for ineffective assistance of counsel, a movant must show by a preponderance of the evidence that his or her trial counsel failed to meet the Strickland test to prove his or her claims. Strickland v. Washington , 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Under Strickland , Movant must demonstrate: (1) his trial counsel failed to exercise the level of skill and diligence reasonably competent trial counsel would in a similar situation, and (2) he was prejudiced by that failure. Id. at 687, 104 S.Ct. 2052.
Movant must overcome the strong presumption trial counsel's conduct was reasonable and effective. Johnson , 406 S.W.3d at 899. To overcome this presumption, a movant must identify "specific acts or omissions of counsel that, in light of all the circumstances, fell outside the wide range of professional competent assistance." Zink v. State , 278 S.W.3d 170, 176 (Mo. banc 2009). Trial strategy decisions may be a basis for finding ineffective assistance of counsel only if that decision was unreasonable. Id. "[S]trategic choices made after a thorough investigation of the law and the facts relevant to plausible opinions are virtually unchallengeable...." Dorsey v. State , 448 S.W.3d 276, 287 (Mo. banc 2014) (quoting Strickland , 466 U.S. at 690, 104 S.Ct. 2052 ).
*601 "To establish relief under Strickland , a movant must prove prejudice." Johnson , 406 S.W.3d at 899. Prejudice occurs when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Deck v. State , 68 S.W.3d 418, 429 (Mo. banc 2002) (quoting Strickland , 466 U.S. at 694, 104 S.Ct. 2052 ). Prejudice in a death penalty case is "a reasonable probability that, but for counsel's deficient performance, the jury would have concluded the balance of aggravating and mitigating circumstances did not warrant death." Forrest v. State , 290 S.W.3d 704, 708 (Mo. banc 2009) (quoting State v. Kenley , 952 S.W.2d 250, 266 (Mo. banc 1997) ).
Points I Through V - Failure to Call Mitigation Witnesses
Movant raises several points alleging trial counsel were ineffective for failing to call witnesses to testify at the penalty phase retrial concerning Movant's mental health before and after the murders. "Ordinarily the choice of witnesses is a matter of trial strategy and will support no claim of ineffective assistance of counsel." Barton , 432 S.W.3d at 750 (quoting State v. Harris , 870 S.W.2d 798, 816 (Mo. banc 1994) ). "This is because 'strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.' " Id. at 750-51. "To prove ineffective assistance for failure to call a witness, the defendant must show that: '(1) trial counsel knew or should have known of the existence of the witness; (2) the witness could be located through reasonable investigation; (3) the witness would testify; and (4) the witness's testimony would have produced a viable defense.' " Glass v. State , 227 S.W.3d 463, 468 (Mo. banc 2007) (quoting Hutchison v. State , 150 S.W.3d 292, 304 (Mo. banc 2004) ).[4] This standard of review will guide the analysis of Movant's first five points on appeal.
Point I - Failure to Call Dr. Lewis Regarding Smith's Violent Past
Movant claims the motion court's judgment was clearly erroneous because trial counsel were ineffective for failing to call Dr. Lewis to testify about the impact Smith's violent and abusive behavior had on Movant. Movant argues trial counsel should not have replicated the first penalty phase's failed strategy to portray Smith as a model father because trial counsel had evidence of actual abuse Smith inflicted on Movant and Linda. Movant argues this evidence was "inherently mitigating," lessened his moral culpability, and would have explained Movant's violent crimes, which were in stark contrast to his nonviolent past.
Prevailing professional standards for capital defense work require trial counsel to "discover all reasonably available mitigating evidence." Wiggins v. Smith , 539 U.S. 510, 524, 123 S.Ct. 2527, 2537, 156 L.Ed.2d 471 (2003) ; Johnson v. State , 388 S.W.3d 159, 165 (Mo. banc 2012). This evidence includes "medical history, educational history, employment and training history, family and social history, prior adult and juvenile correctional experience, and religious and cultural influences." Id. Section 565.032.3 outlines mitigating circumstances, including extreme mental or emotional disturbance, extreme distress or domination by another, and substantial impairment of capacity to appreciate the criminality of his or her conduct or to *602 conform it to the requirements of law, which can be submitted to the jury in an effort to avoid a death sentence.
Trial counsel's selection of which expert witnesses to call at trial generally is a question of trial strategy and is virtually unchallengeable. Goodwin v. State , 191 S.W.3d 20, 29 (Mo. banc 2006). To show ineffective assistance of counsel based on failure to present an expert witness, a movant is required to show what the evidence would have been if the witness had been called. Twenter , 818 S.W.2d at 636.
Movant presented evidence of Smith's violent and abusive past through high school, military, and arrest records. In high school, Smith was expelled for half of the school year because he had been "nothing but trouble." Smith threw books out of a window, cursed at and fought with a teacher, and fought with another student. Smith was later permanently suspended from school due to "continuous disturbances."
Smith joined the military and was involved in several fights, engaged in insubordination, and destroyed property. A physician submitted a report noting Smith was involved in "numerous violent outbursts" and described him as having an "aggressive personality disorder." A military psychiatrist diagnosed Smith with a "character and behavior disorder, explosive personality, as manifested by gross outbursts of rage or physical aggressiveness." It was recommended Smith be administratively discharged due to these issues.
Smith's arrest records indicate, when Movant was five years old, Smith and three other men were involved in an altercation, which involved Smith running the men off of the road and then attacking them with a knife and tire iron. When Movant was ten years old, Smith fired a gun three times at a man while yelling threats at him. When Movant was a teenager, Smith had a relationship with another woman while he was still married to Linda. The arrest records included reports Smith engaged in several acts of violence against this girlfriend and her brother over the course of a year. There was no evidence presented Movant witnessed any of these incidents.
Dr. Lewis summarized the incidents of violence and abuse detailed in Smith's records during her testimony. Dr. Lewis believed Smith's behaviors were unlikely to have changed after he married Linda, but conceded Smith and Linda denied any physical abuse occurred in their relationship. Dr. Lewis noted Movant was very protective of his parents. Dr. Lewis said Movant told her "sometimes he had to come between them." This statement led Dr. Lewis to opine, "So of course, there was violence at home. However, the Smiths denied - in fact, I think that - I think Smith said they were the perfect family, if I'm not mistaken." Movant and his sister reported only one violent outburst by Smith when he discovered Movant ate a cornish game hen Smith intended to eat later. Movant told Dr. Lewis Smith overturned a table, causing it to crash into a chandelier and glass to break. Movant denied ever being hit or spanked by Smith or Linda.
Movant offered testimony from Catherine Luebbering (hereinafter, "Luebbering"), a mitigation specialist on his second trial team. Luebbering was familiar with Smith's records. Luebbering stated the records described Smith as having poor impulse control and a short fuse. Luebbering stated the records reflected Smith did not hesitate to threaten violence and "violence is something that doesn't just turn on or off." Even though Smith was *603 Movant's stepfather, Luebbering considered this evidence "absolutely" mitigating because Smith raised Movant from the time he was ten months old. Luebbering believed Smith had a great impact on Movant's personality, character, and moral development. Ultimately, Luebbering conceded trial counsel believed it was important to present Smith as an upstanding citizen of good moral character, so they did not present the other evidence.
Turlington admitted she had access to Smith's records. Turlington further admitted she was aware of abuse alleged by Smith's former wife and girlfriend. Turlington reviewed the Anderson I trial transcript, including Smith's testimony. Turlington was aware other medical experts testified Movant had unexplained injuries, cigarette burn scars, and suffered a spiral tibia fracture when he was five years old, all of which were likely the result of abuse.
However, at the time of the penalty phase retrial, Turlington found Movant's family was withdrawn from him, did not want to be involved, were very unenthusiastic, and did not display much emotion or feeling toward Movant. Turlington stated Smith was the only person in Movant's immediate family who was engaged with Movant and had positive things to say about him. Turlington stated trial counsel made a decision to present Smith as a positive influence because he was on the city council, employed by the school district, and seemed to be a well-respected member of the community. Turlington noted the absence of evidence Smith was abusive in the household he shared with Movant.
Davis-Kerry testified she had access to all of the materials from Anderson I , including Smith's records, and reviewed them for the penalty phase retrial. Davis-Kerry acknowledged there was evidence Smith was violent in his past, but trial counsel were never able to find a witness who would say Smith's violence translated into something Movant saw or witnessed happening to Linda. Movant, Linda, and Movant's sister denied any abuse occurred. Hence, Davis-Kerry indicated trial counsel were "not confident" they could connect Smith's violent past with Movant at the trial.
Davis-Kerry believed the options concerning Smith's testimony were to put Smith on the stand and "make him the villain" or put Smith on the stand and let him talk about all of the good things about Movant. In Anderson IV , Davis-Kerry testified trial counsel did not want to present Movant as a victim of childhood violence and had to make a choice between the two types of evidence. Trial counsel wanted the jury to hear positive things about Movant through Smith's testimony. Davis-Kerry stated people in the community told them Smith was a "great guy." Hence, keeping Smith's past away from the jury was something Davis-Kerry thought was beneficial to Movant given Smith's positive testimony.
Movant contends trial counsel failed to investigate Smith's actual testimony from Anderson I and were ineffective for replicating the first trial team's strategy of presenting Smith in a positive light. Movant argues trial counsel were ineffective when professing to pursue a different trial strategy, but ultimately presenting Smith in the same positive light. Movant cites Davis-Kerry's following testimony from Anderson IV as support:
We did not want to paint [Movant] as this ... child who suffered abuse at the hands of ... Smith because, number one, [Movant] never said he did, and we specifically asked him about that. And number two, in the past I have presented that kind of evidence. I think that kind of evidence was presented somewhat *604 to the first jury that [Movant] was in front of, and it wasn't successful. We wanted to do something different. We wanted to try a different approach to try to get him off of death row.
(Emphasis added).[5] Turlington testified in Anderson IV trial counsel considered presenting evidence of violence Movant was exposed to as a child, but they "made a decision not to pursue that sort of mitigation and go with a more, a different approach."
Movant argues this testimony from Anderson IV demonstrates trial counsel failed to investigate what Smith's actual testimony was during Anderson I and renders trial counsel ineffective for believing they presented different testimony from Smith at the penalty phase retrial. While trial counsel may have been mistaken about the content of Smith's testimony in Anderson I , the record reveals trial counsel had additional strategic reasons for not presenting testimony about Smith's violent and abusive past.
On cross-examination in Anderson IV , Davis-Kerry explained that by "doing something different," trial counsel wanted to streamline the mental health evidence and present more lay witnesses who could testify about what they witnessed between Movant and the Rainwaters. Davis-Kerry spoke about how they wanted the jury to hear from Movant to explain what he was thinking and feeling at the time of the murders. Davis-Kerry reiterated they considered presenting evidence of Smith's violent abusive past, but it was not something Movant endorsed, despite Smith's admission he had a temper and acted out in the past. Turlington also explained they did not believe presenting this evidence would be compelling because "you don't have a lot of really concrete information about what happened in the home and without a really strong link between that prior violent behavior and what happened in the incident." Trial counsel also presented several strategic reasons they chose not to present this evidence through Dr. Lewis' testimony, which will be discussed with respect to Point III.
Movant cites several cases holding trial counsel ineffective for failing to provide mitigation evidence of childhood abuse suffered by a defendant. In Williams v. Taylor , 529 U.S. 362, 120 S.Ct. 1495, 1514, 146 L.Ed.2d 389 (2000), the United States Supreme Court found trial counsel was ineffective when
[t]he record establishe[d] that counsel did not begin to prepare for [the sentencing] phase of the proceeding until a week before the trial. They failed to conduct an investigation that would have uncovered extensive records graphically describing [the defendant's] nightmarish childhood, not because of any strategic calculation but because they incorrectly thought that state law barred access to such records. Had they done so, the jury would have learned that [the defendant's] parents had been imprisoned for the criminal neglect of [the defendant]
*605 and his siblings, that the defendant had been severely and repeatedly beaten by his father, that he had been committed to the custody of the social services bureau for two years during his parents' incarceration (including one stint in an abusive foster home), and then, after his parents were released from prison, had been returned to his parents' custody.
Id. at 395, 120 S.Ct. 1495 (internal citation and footnote omitted). The Supreme Court further explained
the failure to introduce the comparatively voluminous amount of evidence that did speak in [the defendant's] favor was not justified by a tactical decision to focus on [the defendant's] voluntary confession. Whether or not those omissions were sufficiently prejudicial to have affected the outcome of sentencing, they clearly demonstrate that trial counsel did not fulfill their obligation to conduct a thorough investigation of the defendant's background.
Id. at 396, 120 S.Ct. 1495. Hence, although trial counsel made a tactical decision to focus on a different aspect of the defendant's case, trial counsel still failed to conduct a thorough investigation to uncover mitigating evidence. See also Wiggins , 539 U.S. at 524-26, 123 S.Ct. 2527 (holding trial counsel ineffective for failing to conduct a social history investigation detailing the defendant's childhood trauma and stating the record suggested trial counsel's "failure to investigate thoroughly resulted from inattention, not reasoned strategic judgment"); Rompilla v. Beard , 545 U.S. 374, 389, 125 S.Ct. 2456, 2467, 162 L.Ed.2d 360 (2005) (holding trial counsel ineffective for failing to review the defendant's prior conviction file and transcript, which would have revealed a wide range of mitigation evidence previously undiscovered); Porter v. McCollum , 558 U.S. 30, 40, 130 S.Ct. 447, 453, 175 L.Ed.2d 398 (2009) (holding trial counsel ineffective for failing to discover expansive mitigating evidence concerning the defendant's mental health, mental impairment, his family background, and his military service); Griffin v. Pierce , 622 F.3d 831, 844-45 (7th Cir. 2010) (holding trial counsel ineffective for failing to present any mitigation evidence concerning the defendant's home life, mental health issues, and struggles with addiction).
These cases are inapposite because they concerned instances when trial counsel failed to investigate, discover, and present evidence of childhood trauma or abuse. In Movant's case, this is not an instance when trial counsel failed to investigate or discover the evidence Movant submits should have been offered in mitigation. Trial counsel did not disregard or ignore potential mitigating evidence. The record reflects trial counsel had access to and reviewed the copious records indicating Smith's violent and abusive past. However, trial counsel both testified they could not connect Smith's behavior with Movant and were not confident presenting that theory at trial. This contrasts with the cases Movant relies on in which trial counsel failed to investigate, discover, or present mitigating evidence that was readily available and had a link to the defendant's upbringing.
Because trial counsel had no direct evidence Smith abused Movant or Movant witnessed Smith's abuse against other family members, trial counsel believed presenting Smith as an involved and caring stepfather was the most beneficial use of his testimony. Even if this Court disagrees or questions that strategy, "[t]he question in an ineffective assistance claim is not whether counsel could have or even, perhaps, should have made a different decision, but rather whether the decision made was reasonable under all the circumstances." Johnson , 406 S.W.3d at 901 *606 (quoting Henderson v. State , 111 S.W.3d 537, 540 (Mo. App. W.D. 2003) ). Here, trial counsel were not ineffective for failing to call Dr. Lewis to present testimony regarding Smith's violent and abusive past when some of this evidence was remote in time, and trial counsel could not establish Movant suffered or witnessed any abuse at Smith's hand.
Movant contends the motion court's judgment erroneously states evidence of Smith's violent and abusive past was presented in previous proceedings based on trial counsel's mistaken testimony from Anderson IV . The motion court's judgment twice states evidence of Smith's violent and abusive past was presented during Anderson I , and it was not persuasive or successful. This finding is clearly refuted by the trial transcript from Anderson I . However, the motion court further explained the likelihood of this evidence being unsuccessful was obvious, in that trial counsel would have had to implore the jury to speculate Movant was exposed to similar behavior in his household because there was no direct evidence any abuse occurred. The motion court discounted Smith's high school and military records because they predated Movant's birth. The motion court further found Movant failed to demonstrate how he would have admitted Smith's arrest records into evidence, an issue Movant does not address on appeal. Because the record supported the motion court's ultimate finding trial counsel were not ineffective for failing to present evidence of Smith's violent and abusive past, the motion court did not clearly err in denying this claim.
Point II - Failure to Call Smith's Former Wife
Movant claims the motion court's judgment was clearly erroneous because trial counsel were ineffective for failing to call Smith's former wife, Earline Smith (hereinafter, "Earline"), to testify about Smith's violent and abusive behavior during and after their marriage. Movant argues reasonable trial counsel would have presented Earline's testimony to demonstrate the intensity and magnitude of domestic violence Smith inflicted for the jury to consider in conjunction with Dr. Lewis' testimony.
The parties presented a stipulation of Earline's testimony at the evidentiary hearing.[6] Earline stated she was married to Smith for eleven years, and they had three children, including Deborah. Earline stated Smith frequently beat her and was verbally abusive to their children. Earline alleged Smith committed adultery with several women, including Linda, while they were married. Earline outlined instances of physical abuse requiring subsequent surgeries and additional treatment to heal. Earline alleged Smith repeatedly raped her during their marriage. Earline stated Smith stalked her and threatened her even after their relationship was over. Earline indicated she met with Dr. Lewis in 1998 and with a member of Movant's first trial team to share this information.
Turlington testified she and Davis-Kerry interviewed Earline, and they discussed whether to "get into this matter" and how to present it if they chose to do so. Turlington stated the incidents Earline recounted were in the "fairly distant past." Turlington agreed the jury could have drawn an inference Smith was violent in the home he shared with Movant after hearing Earline's testimony. However, Turlington also noted Movant, Linda, Movant's *607 sister, and Smith all denied any abuse occurred in their household. Movant denied Smith ever spanked or struck him. Davis-Kerry testified they were never able to connect the notion Movant committed the murders because he experienced or witnessed abuse by Smith.
The motion court found Earline's testimony related to events preceding Movant's birth was not helpful, relevant, or compelling. This Court agrees. Movant is unable to link Earline's experiences as Smith's wife to any explanation of Movant's mental state at the time of the murders that would provide mitigating evidence. Movant, Linda, Smith, and Movant's sister all consistently denied any abuse occurred in their home. There were no witnesses who could testify Smith committed any act of violence against Movant or his family. "Where counsel has investigated possible strategies, courts should rarely second-guess counsel's actual choices." Barton , 432 S.W.3d at 749 (quoting Anderson II , 196 S.W.3d at 33 ). Trial counsel investigated Earline's claims, discussed whether and how to present them, and ultimately chose not to present her testimony given the lack of a nexus between the abuse occurring in her home and the absence of abuse in Movant's home. Trial counsel were not ineffective for failing to present Earline's testimony. The motion court did not clearly err in denying this claim.
Point III - Failure to Call Dr. Lewis Regarding Movant's Mental State
Movant argues the motion court's judgment was clearly erroneous because trial counsel were ineffective for failing to call Dr. Lewis to testify and offer mitigating evidence regarding his mental state before and after the murders. Movant alleges Dr. Lewis would have testified he had impaired intellectual functioning and suffered from a psychotic depression characterized by paranoia and delusions while living with a dysfunctional family. Movant believes had this evidence been presented, he would have received a life sentence.
Prior to the first trial, Dr. Lewis testified regarding Movant's mental competency to stand trial. Dr. Lewis opined Movant was extremely paranoid, delusional, and had signs of dissociation. The circuit court rejected this evidence and found Movant was competent to stand trial. Dr. Lewis also testified during the guilt phase of Movant's first trial, opining Movant was extremely paranoid, delusional, and had signs he was dissociated when he shot the Rainwaters. Dr. Lewis was not called as a witness to testify at the penalty phase retrial.
Dr. Lewis next testified by deposition during Anderson IV , and the same deposition was admitted into evidence at the most recent hearing. Dr. Lewis testified Movant was depressed on the day of the murders, ruminating about being abandoned by his biological father, and feeling as though he was being forced to abandon his daughter. Dr. Lewis testified Movant was in an altered state when he committed the murders. Dr. Lewis rejected the notion Movant was malingering because he readily admitted he shot Stephen but was "absolutely convinced" he had not shot Debbie. Dr. Lewis acknowledged there were "equally plausible" explanations for Movant's independent memories of shooting Debbie, but she discounted the possibility Movant lied to her because he would have to be "extremely crafty" to do so.
Trial counsel both testified about working with Dr. Lewis to prepare for the penalty phase retrial. Trial counsel were aware of Dr. Lewis' diagnoses, reports, and prior trial testimony. Turlington testified they also prepared Dr. Holcomb to testify and decided to present his testimony *608 instead of Dr. Lewis' for several reasons. Turlington stated Movant did not like Dr. Lewis. Specifically, Movant took issue with certain aspects of Dr. Lewis' reporting, including whether he and his sister had auditory hallucinations and whether he was in a dissociative state when he committed the murders. Further, Dr. Holcomb was in agreement with Dr. Lewis' other diagnoses, which trial counsel planned to present.
Davis-Kerry detailed how "very, very difficult" it was to work with Dr. Lewis. Davis-Kerry relayed an incident in which Dr. Lewis denied receiving records that were delivered with a signed receipt, and she complained about the way the records were organized. Davis-Kerry testified Dr. Lewis had no recollection of the facts of Movant's case until her memory was refreshed, and yet she continued to get the facts wrong. Davis-Kerry stated Dr. Lewis requested an exorbitant fee the public defender's office could not approve. Davis-Kerry also described how Dr. Lewis was not "doing the work" because they waited many months for information from Dr. Lewis and she had not reviewed the records. Ultimately, Davis-Kerry testified they did not call Dr. Lewis because she was not helpful and they were extremely uncomfortable with using her because they "would have not had any idea what would have come out of her mouth."
The motion court specifically found Dr. Lewis' testimony regarding Movant's mental state not credible. The motion court here found Dr. Lewis did not have a good grasp of the facts. The motion court further found Dr. Lewis was the victim of Movant's fabrication regarding his memory of shooting Debbie, which damaged any credibility she might otherwise have had. The record supports this finding. "This Court will not challenge the motion court's determination of Dr. [Lewis'] credibility as it could make the best observation or trial counsel's strategic decision not to call a witness." Forrest , 290 S.W.3d at 715 (internal citation omitted). Further, trial counsel provided strategic reasons for choosing to present one expert witness to the exclusion of another. "Counsel may choose to call or not call almost any type of witness or to introduce or not introduce any kind of evidence for strategic considerations." Vaca v. State , 314 S.W.3d 331, 337 (Mo. banc 2010). The motion court did not clearly err in denying this claim.
Point IV - Failure to Call Dr. Holcomb Regarding Movant's Mental State
Movant alleges the motion court's judgment was clearly erroneous because trial counsel were ineffective for failing to call Dr. Holcomb to present evidence regarding Movant's mental health issues. Movant argues trial counsel should have apprised Dr. Holcomb of his changed testimony about always remembering shooting Debbie and discussed with Dr. Holcomb what impact this revelation would have on his testimony concerning Movant's diagnoses. Movant believes Dr. Holcomb's testimony would have provided mitigating evidence he suffered from psychotic depression, characterized by paranoia and delusions, which, if presented, would have resulted in him receiving a life sentence.
In preparation to testify at Movant's first trial, Dr. Holcomb relied on Dr. Lewis' report, which collected background information on Movant that was "very helpful" to him. Dr. Holcomb stated Movant "adamantly refused" to admit he shot Debbie because he had no memory of it. Dr. Holcomb believed Movant did not remember shooting Debbie and suffered from psychogenic amnesia.
In 2008, Turlington and Davis-Kerry contacted Dr. Holcomb about testifying at the penalty phase retrial. Dr. Holcomb *609 evaluated Movant again, at which time Movant continued to deny remembering shooting Debbie. Dr. Holcomb's mental health findings remained the same from Movant's first trial in that he believed Movant suffered from major depression with psychotic features, paranoia, and psychogenic amnesia. Dr. Holcomb was present and ready to testify at the penalty phase retrial, but he was dismissed without testifying. Trial counsel did not discuss with Dr. Holcomb Movant's revelation he always remembered shooting Debbie or ask him how this revelation would impact his testimony. Dr. Holcomb testified he continued to believe Movant suffered from psychogenic amnesia despite his revelation.
Turlington testified Dr. Holcomb's diagnoses matched Dr. Lewis' diagnoses. Turlington described Movant's revelation about remembering shooting Debbie as a "bombshell." Turlington stated if Movant was going to testify he remembered all of the events of the murders, it would undercut Dr. Holcomb's diagnoses, undercut Movant's credibility because he had been lying for ten or eleven years about what happened, and demonstrate Movant fooled the doctors. Turlington acknowledged she only told Dr. Holcomb there was a change in trial strategy when she informed him he would not testify.
Davis-Kerry testified they intended to call Dr. Holcomb to testify about Movant's mental state at the time of the murders and his inability to recall certain parts of the event. Davis-Kerry stated Dr. Holcomb was not called to testify because Movant told them after the trial began he lied to the doctors and remembered everything. Davis-Kerry said Movant told them he "was playing with Dr. Lewis when she diagnosed him." Davis-Kerry reiterated Movant's revelation was a "huge change" in how she would present his testimony and "substantially changed" how trial counsel planned to argue the case to the jury. Davis-Kerry stated she was not going to put Movant on the stand and then call Dr. Holcomb who would testify Movant could not remember the events. Davis-Kerry explained her biggest concern about having Dr. Holcomb testify was that his opinions were based on false information he received from Movant. Trial counsel struggled with weighing ethical decisions in addition to what they thought would still be most effective for Movant's trial in light of learning Movant had been lying to his doctors for years and Dr. Holcomb relied on those other doctors' reports in forming his diagnoses.
The motion court found Dr. Holcomb came across as more rational and reasonable than Dr. Lewis. However, the motion court found the credibility of Dr. Holcomb's opinions and conclusions were undermined greatly by Movant's revelation he lied about his ability to remember shooting Debbie and due to his reliance on Dr. Lewis' conclusions and reports. The motion court further found Dr. Holcomb's attempts to defend his conclusions and opinions, in spite of being duped by his client, further damaged his credibility. This Court defers to "the motion court's superior opportunity to judge the credibility of witnesses." Davis v. State , 486 S.W.3d 898, 905 (Mo. banc 2016) (quoting Barton, 432 S.W.3d at 760 ).
"When defense counsel believes a witness' testimony would not unequivocally support his [or her] client's position, it is a matter of trial strategy not to call him [or her], and the failure to call such witness does not constitute ineffective assistance of counsel." Winfield v. State , 93 S.W.3d 732, 739 (Mo. banc 2002). Trial counsel explained in great detail why they felt Dr. Holcomb could not testify after learning of Movant's revelation *610 about shooting Debbie. While trial counsel admitted they did not explain Movant's revelation to Dr. Holcomb, it is clear Dr. Holcomb persisted in his diagnosis of psychogenic amnesia. Although failing to call Dr. Holcomb resulted in Movant having no metal health expert testify on his behalf, trial counsel felt Dr. Holcomb's testimony would undercut Movant's testimony and not come across as credible. "No matter how ill-fated it may appear in hindsight, a reasonable choice of trial strategy cannot serve as a basis for a claim of ineffective assistance." Johnson , 406 S.W.3d at 900. Trial counsel acted reasonably in choosing to forego Dr. Holcomb's testimony after Movant's revelation. The motion court did not clearly err in denying this claim.
Point V - Failure to Call Other Witnesses Regarding Movant's Mental Health
Movant argues the motion court's judgment was clearly erroneous because trial counsel were ineffective for failing to call four additional witnesses who would have testified about their observations of Movant's disoriented and distressed mental state before and after the murders. Movant believes all four witnesses would have provided a basis for trial counsel to submit Movant was under extreme mental or emotional disturbance when he shot Debbie, and had the jury heard this mitigation evidence, he would have received a life sentence.
Tim Jones
Tim Jones (hereinafter, "Jones") testified he and Movant had been friends since childhood and worked together as adults. In 1999, Jones accompanied his cousins when they spoke with Movant's original trial team. Jones did not answer any specific questions posed during the meeting, but contributed to the conversation. Jones denied telling the first trial team Movant told him if the Rainwaters were not going to let him see his daughter, then they would not get to see his daughter either.[7] Jones stated, right before the murders, Movant was distant, in a daze, and worried about the Rainwaters trying to keep him from seeing his daughter. Jones thought Movant was more depressed and drank more than usual. Jones did not speak with anyone about testifying for the penalty phase retrial.
Luebbering testified Jones was interviewed by the first trial team. Luebbering stated she attempted to contact Jones by telephone, and when she went to Poplar Bluff to interview other witnesses, she was unsuccessful in locating him. Turlington testified they were not successful in reaching Jones and did not attempt to contact him after March 2008. Davis-Kerry did not have a specific recollection of Jones, but noted Luebbering had a number of witnesses who would not return her calls or were not forthcoming with information when she found them. Davis-Kerry testified she would have considered Jones' proposed testimony, but stated they "develop[ed] information along those lines and submitted it to the jury in this case."
The motion court found Jones' conveying Movant's statement regarding the Rainwaters not getting to see his daughter could be deemed ominous by a juror and not helpful to the defense. The motion court believed this statement would only bolster the prosecutor's argument the murders were premediated and no defense attorney would open the door to that testimony. The motion court noted Turlingon's *611 testimony in Anderson IV that trial counsel "had a number of people that already said the same thing that we believed ... Jones was going to say" and "at a certain point, we felt like we had enough witnesses that were saying the same type of information."
This Court finds Jones' statement about Movant threatening the Rainwaters had the potential to present Movant in a negative light and support the prosecution's theory Debbie's murder was premeditated. Because Jones' testimony would undermine the defense's theory at trial, this Court will not find trial counsel ineffective for failing to present his testimony. Tisius v. State , 519 S.W.3d 413, 428 (Mo. banc 2017).
Adrienne Dionne Webb[8]
Adrienne Dionne Webb (hereinafter, "Dionne") grew up in Movant's neighborhood, and they were good friends. Dionne testified Movant changed after his daughter was born. Dionne described Movant as not relaxed, unkempt, cynical, very negative about things, and agitated. Dionne speculated Movant was using drugs because he was messy, sweaty, and unshaven. Dionne stated Movant was "totally, totally different" and acted paranoid. Dionne testified she remembered her husband, Maurice, met with the second trial team because she was recovering from surgery.
Luebbering testified she met with Dionne and Maurice before Dionne had surgery. Dionne told Luebbering Movant was not himself and seemed to be saying goodbye to people right before the murders. Luebbering testified Dionne had surgery in October 2007, and the trial team attempted to revisit her home in February 2008. Maurice told Luebbering he would contact her, but he failed to do so. Luebbering had a notation in the file that Maurice was avoiding them. Turlington testified she went to Dionne's home to speak to her, but Maurice said Dionne was sick and would not give Turlington access to her. Turlington believed Luebbering and Davis-Kerry both tried to contact Dionne again, and Maurice declined to talk to them. Davis-Kerry testified she remembered Maurice but not Dionne. Davis-Kerry admitted if Movant's friend indicated he was acting strangely on the day of the murders, she would want to follow up on that information.
Trial counsel will not be found ineffective for failing to call an uncooperative witness. Leisure v. State , 828 S.W.2d 872, 878 (Mo. banc 1992). The motion court concluded the second trial team made reasonable efforts to reach Dionne and there was evidence presented Dionne and Maurice did not cooperate with the trial team. Further, the motion court correctly determined Dionne's testimony would not provide compelling evidence Movant was not responsible for the murders.
Steven Lamont Stovall[9]
Steven Lamont Stovall (hereinafter, "Stovall") went to high school with Movant. Stovall saw Movant in passing in the Butler County jail shortly after Movant was arrested. Stovall described Movant as "absent-minded" and he did not seem to know why he was in jail.
Luebbering testified there was no effort or conversation about obtaining Movant's Butler County jail records, and no one contacted Stovall. Turlington echoed Luebbering's *612 testimony regarding no efforts were made to interview anyone Movant was incarcerated with in Butler County. Davis-Kerry testified, while she would have wanted to know Stovall's observations, she was not sure they would have called him as a witness because Stovall had no mental health expertise. However, Davis-Kerry could have passed Stovall's observations along to Dr. Holcomb.
To prevail on a claim for failing to call a witness, Movant must demonstrate trial counsel knew or should have known of Stovall's existence as a witness. Glass , 227 S.W.3d at 468. Movant failed to present any evidence the second trial team knew or should have known Stovall was a potential witness. The motion court found Stovall's testimony was neither compelling nor persuasive given Stovall simply passed by Movant for a few seconds while he was in a cell. The motion court also discounted Stovall's testimony because he had multiple prior convictions and was in jail due to a probation revocation, which would impact his credibility. Trial counsel was not ineffective for failing to present Stovall as a witness.
Larry Woods[10]
Woods testified he served Movant a witness subpoena in an unrelated case a few months before the murders occurred. Woods described Movant as bright, cooperative, mentally alert, and clean cut. Movant complied with the subpoena and testified at the trial as requested.
Shortly after Movant was arrested, Woods went to the Butler County jail to take Movant's application for public defender services. Movant would not answer Woods' questions, he did not know who Woods was, and he did not know why he was in jail. Woods returned to the public defender's office and informed his supervisor Movant needed to speak to a psychiatrist immediately to obtain a full picture of Movant's mental status. Woods met with Movant at least four times after he was arrested.
After the public defender's capital division received Movant's case, Woods continued to cooperate by trying to find witnesses. Woods testified during Anderson I , stating Movant had no memory of the murders. Woods did not remember speaking to trial counsel, but recalled speaking with Luebbering, who testified Woods "always cooperated in the past" when she spoke to him.
Turlington testified Luebbering had no contact with Woods after October 2007, and she described him as uncooperative. Turlington intended to call Woods, but there was a "pretty drastic change in our trial strategy that occurred in the middle of the trial and I think we may have changed direction at the last minute." Davis-Kerry testified when the second trial team visited Poplar Bluff, they made an appointment to meet with Woods. Trial counsel went to the appointment, but Woods did not appear, even after being reminded about the appointment. Davis-Kerry thought Woods would not be as helpful as they thought and the same information could have come out during Dr. Holcomb's testimony.
The motion court discounted Woods' testimony in Anderson I and found Davis-Kerry credible when she described Woods as uncooperative and "dodging" the defense team. Further, the motion court found Woods' testimony of Movant's clarity when Movant was subpoenaed as a witness conflicted with Dr. Lewis' testimony *613 Movant was in a dissociative state for a significant period of time prior to the murders. Finally, the motion court discounted Woods' credibility because of his bias having worked at the public defender's office for many years.
The motion court found Davis-Kerry's testimony regarding Woods' lack of cooperation credible. This Court defers to the motion court's judgment regarding Davis-Kerry's credibility. Davis , 486 S.W.3d at 905. Further, even if Woods were cooperative, trial counsel will not be held ineffective for failing to present testimony from witnesses who possesses "obvious bias" making them "easily impeachable." State v. Chambers , 891 S.W.2d 93, 111 (Mo. banc 1994). Woods' employment as a public defender investigator for many years would provide fertile impeachment evidence of bias that would not support Movant's case. Finally, Woods' testimony about Movant's inability to remember anything about the murders would be undercut by Movant's revelation he always remembered shooting Debbie. The motion court did not clearly err in denying these claims.
Point VI - Failure to Object to Improper Cross-Examination
Movant claims the motion court's judgment was clearly erroneous because trial counsel were ineffective for failing to object timely during Movant's cross-examination to questions asking him whether the jury should believe him as opposed to the state's witnesses. Movant argues he was prejudiced by this line of questioning because it injected arbitrariness into the penalty phase retrial.
When evaluating whether trial counsel's failure to object was strategic, "this Court is mindful that: 'In many instances seasoned trial counsel do not object to otherwise improper questions ... for strategic purposes. It is feared that frequent objections irritate the jury and highlight the statements complained of, resulting in more harm than good.' " Barton , 432 S.W.3d at 754 (quoting State v. Tokar , 918 S.W.2d 753, 768 (Mo. banc 1996) ).
During Movant's penalty phase retrial cross-examination, the prosecutor asked Movant if Abbey's testimony about the abuse he inflicted on her was a lie. Movant denied he abused Abbey. The prosecutor again asked Movant if Abbey was lying. Movant stated, "Yes." The prosecutor then asked if another witness was "lying on [him] too," to which Movant responded, "I don't know what she's doing." The prosecutor responded, "Well, you're saying that's not true, so you must be calling her a liar." Davis-Kerry objected, stating Movant was asked to comment on another witness's testimony. The circuit court sustained Davis-Kerry's objection.
Movant argues this line of questioning was improper pursuant to State v. Roper , 136 S.W.3d 891 (Mo. App. W.D. 2004). In Roper , the court of appeals explained:
The principle that a witness should not be asked to opine upon the truth or veracity of another witnesses' [sic] testimony has a long history in Missouri. In Holliman v. Cabanne , 43 Mo. 568, 570 (1869), [this] Court stated, 'Witnesses should not give their opinions upon the truth of a statement by another witness, though they may do the same thing in effect by denying the fact stated.'
Roper , 136 S.W.3d at 900. Roper relied on analysis from State v. Savory , 893 S.W.2d 408 (Mo. App. W.D. 1995), which held, "[W]hen seeking to expose contradiction between the testimony of several witnesses, an attorney may not directly ask one witness if another was lying." Id. The court of appeals found the prosecutor's repeated questioning of the defendant *614 about the veracity of other witnesses was improper. Roper, 136 S. W.3d at 902-03. However, the court of appeals declined to grant the defendant in Roper relief because he failed to demonstrate a manifest injustice or miscarriage of justice occurred due to the substantial evidence of the defendant's guilt presented at trial. Id. at 904.
When applying the analysis from Roper , the prosecutor's line of questioning here was improper. However, Roper is distinguishable from the case at bar because Davis-Kerry objected, and her objection was sustained. Movant alleges the objection was not timely and he suffered prejudice. The motion court disagreed, recognizing although the prosecutor's questions were improper, they were not inflammatory and had no impact on the jury's decision.
At the evidentiary hearing, Davis-Kerry testified she did not recall whether she considered objecting earlier during Movant's cross-examination. However, Davis-Kerry explained, when deciding to object to misstatements of law or argumentative questions, she "looks at how it is coming across to the jury." Davis-Kerry said she might object or she might not object and respond in her closing argument. Davis-Kerry further stated when a prosecutor argues her client is lying, addressing this accusation is best reserved for closing argument. Although Davis-Kerry had no specific recollection about why she did not object earlier during this particular line of questioning, she stated she was confident she thought about it and made a "quick mental calculation." It is clear Davis-Kerry had a general strategy for addressing these lines of questions, which included addressing the issue in closing argument, and in this case, raising a meritorious objection, which was sustained. The motion court did not clearly err in denying this claim.
Point VII - Failure to Object to Admission of the Ex Parte Order of Protection
Movant alleges the motion court's judgment was clearly erroneous because trial counsel were ineffective for failing to object to the wholesale admission of a copy of Abbey's ex parte petition and order of protection during the penalty phase retrial. Movant argues reasonable counsel should have objected to admission of the exhibit or requested the factual allegations be redacted because Movant was not afforded the opportunity to challenge the accusations. Movant argues he was prejudiced because the state used the allegations to establish Movant lied when he denied physically abusing Abbey.
"The mere failure to make objections does not constitute ineffective assistance of counsel." Dorsey , 448 S.W.3d at 289 (quoting Ervin v. State , 80 S.W.3d 817, 822 (Mo. banc 2002) ). "To obtain postconviction relief based on a failure to object, it 'must have been of such character as to deprive the defendant substantially of his right to a fair trial.' " Id.
Prior to the penalty phase retrial, Turlington filed a motion to exclude evidence of unadjudicated bad acts related to the violence between Movant and Abbey, which resulted in the ex parte order of protection being issued. Turlington argued this evidence would be introduced without any burden of proof or any instructional guidance for the jury to follow, thus resulting in a due process violation. The state argued the deterioration of Movant and Abbey's relationship proved Movant's motive for shooting Debbie. The circuit court overruled Turlington's motion.
The ex parte petition and order were offered during Abbey's testimony. Turlington *615 objected, stating, "Pursuant to our previous objection." During cross-examination, Abbey testified, "I went to the police station and showed them my body and got a restraining order." During redirect examination, Abbey stated she obtained the ex parte order "because [Movant] beat me" and described other forms of physical abuse Movant inflicted on her. No objection was made. During recross-examination, Turlington asked Abbey about other incidents of violence with Movant. Turlington testified at the evidentiary hearing she did not remember an alternative reason for objecting to the ex parte order admission, nor did she raise the issue of redacting the order when it was passed to the jury.
Movant makes much of the fact the ex parte order contained a finding there was "good cause" to issue it, arguing the document should not have been published to the jury. Movant relies primarily on State v. Clevenger , 289 S.W.3d 626, 630 (Mo. App. W.D. 2009), in which the court of appeals held publication of an order of protection to the jury during a domestic assault trial constituted reversible error because it contained prejudicial hearsay allegations about prior assaults the defendant committed. The order of protection was published to the jury, and the circuit court permitted the jury to view the order and supporting paperwork during deliberations. Id. at 628. The court of appeals found the defendant was prejudiced by the jury's consideration of the order because he had no opportunity to cross-examine the victim regarding the hearsay allegations, the victim did not testify regarding the incidents referenced in the petition, and the jury had no knowledge of the prior incidents before the exhibit was published during deliberations. Id.
Movant's citation to Clevenger is unpersuasive because the facts of his case are distinguishable. Although the ex parte petition and order of protection were published to the jury, the jury did not request to see any exhibits during its deliberations. Further, Abbey testified and was available for cross-examination. Moreover, even assuming the jury had access to the entire ex parte petition and order, Movant was not in danger of the jury using its contents to adjudicate his guilt, which was determined in the first trial.
Moreover, Movant ignores that "[e]vidence of a defendant's prior unadjudicated criminal conduct is admissible during the penalty phase" as a non-statutory aggravator. State v. Christeson , 50 S.W.3d 251, 269 (Mo. banc 2001). The motion court found the admission was proper despite Turlington raising the correct objection. Because the ex parte order was admissible, this Court will not hold trial counsel ineffective for failing to make a nonmeritorious objection. Worthington v. State , 166 S.W.3d 566, 581 (Mo. banc 2005). The motion court did not clearly err in denying this claim.
Point VIII - Advising Movant to Testify
Movant argues the motion court's judgment was clearly erroneous because trial counsel were ineffective for advising him to testify in the penalty phase retrial in that his testimony did not constitute mitigating evidence. Movant claims reasonable counsel would not have advised him to testify because other witnesses could humanize him, and there was no need for Movant to accept responsibility for his actions because the jury already determined his guilt.
The decision whether to exercise the right to testify rests exclusively with the defendant. Jones v. Barnes , 463 U.S. 745, 751, 103 S.Ct. 3308, 3312, 77 L.Ed.2d 987 (1983). "As a general matter, 'an attorney's advice regarding whether or *616 not a defendant should testify is a matter of trial strategy." ' Davis , 486 S.W.3d at 917 (quoting State v. George , 937 S.W.2d 251, 257 (Mo. App. E.D. 1996) ). When defendants later claimed ineffective assistance of counsel regarding such advice, appellate courts have held that "[b]arring exceptional circumstances, such a claim is not a ground for relief." Id. (citing State v. Williams , 853 S.W.2d 371, 378 (Mo. App. E.D. 1993) and Kenney v. State , 46 S.W.3d 123, 129 (Mo. App. W.D. 2001) ).
Movant has not presented exceptional circumstances demonstrating he is entitled to relief on this claim. Trial counsel testified they discussed whether it would beneficial for Movant to testify with prior trial counsel and raised the issue with Movant. Trial counsel's primary purposes in having Movant testify was to humanize him, to have him state remorse for the murders, and to express love for his daughter. Trial counsel had concerns about Movant testifying and addressed Movant's own concerns about testifying in the months leading up to the penalty phase retrial. Trial counsel extensively discussed the topics of Movant's testimony and brought in another attorney from their office to prepare Movant for cross-examination. Trial counsel testified after Movant revealed he always remembered shooting Debbie, they had to change their strategy dramatically and discussed with Movant the consequences of his revelation for several hours. Although Movant believed other witnesses could have humanized him or explained his mental state on the night of the murders, Movant has not presented evidence trial counsel acted unreasonably when advising him to testify. The motion court did not clearly err in denying this claim.
Point IX - Adopting Prior Motion Court's Findings
Movant claims the motion court clearly erred in overwhelmingly adopting into the current judgment the findings and conclusions the prior judge reached from Anderson IV . Movant argues, because the prior judge should have disqualified himself, the motion court's adoption of his written findings rendered the remand meaningless.
When the motion court adopts findings of fact and conclusions of law drafted by another, the findings and conclusions must be supported by the evidence presented. Skillicorn v. State , 22 S.W.3d 678, 690 (Mo. banc 2000). "In the absence of independent evidence that the court failed to thoughtfully and carefully consider the claims, 'there is no constitutional problem with the court adopting in whole or in part the findings of fact and conclusions of law drafted by one of the parties.' " State v. Ferguson , 20 S.W.3d 485, 510 (Mo. banc 2000) (quoting Kenley , 952 S.W.2d at 261 ).
A careful review of the current findings reveals the motion court did not engage in a "wholesale adoption" of the prior judge's previous findings to the prejudice of Movant. This Court's comparison of the two sets of findings reveal substantial similarities exist, particularly regarding the conclusions of law reached, which appear to be verbatim, except for the prior judge's reference to extrajudicial information that were omitted. Movant's complaint the motion court's factual findings echo those of the prior judge in many respects is due to the motion court reviewing the exact same exhibits and deposition testimony offered in Anderson IV for many of the witnesses. Yet the motion court's findings of fact contain significantly different findings regarding the live testimony presented by Dr. Holcomb, Turlington, and Davis-Kerry at the most recent evidentiary hearing, all of whom testified during Anderson IV . These significant changes demonstrate the *617 motion court carefully considered all of the evidence presented.
Movant also points out minor errors throughout the current judgment appearing to carry over from the prior judge's judgment. Minor errors in the motion court's findings do not establish the court did not carefully consider the proposed findings. State v. Phillips , 940 S.W.2d 512, 521 (Mo. banc 1997). Finally, Movant failed to present any independent evidence the motion court failed to thoughtfully and carefully consider his claims. This claim does not warrant remand for a new evidentiary hearing.
Point X - Ineffective Assistance of Appellate Counsel
Movant alleges the motion court's judgment was clearly erroneous in denying his claim he received ineffective assistance of appellate counsel, who failed to raise proportionality review under section 565.035.3 in both of his direct appeals. Movant argues proportionality review is mandated statutorily, and this Court has found death sentences to be disproportionate. Movant argues, had appellate counsel raised proportionality review on appeal, this Court would have found his death sentence was disproportionate and imposed a life sentence.
"To prevail on a claim of ineffective assistance of appellate counsel, the movant must establish that counsel failed to raise a claim of error that was so obvious that a competent and effective lawyer would have recognized and asserted it." Williams v. State , 168 S.W.3d 433, 444 (Mo. banc 2005). "There is no duty to raise every possible issue asserted in the motion for new trial on appeal, and no duty to present non-frivolous issues where appellate counsel strategically decides to winnow out arguments in favor of other arguments." Tisius , 519 S.W.3d at 431-32. Additionally, the movant must prove, "if counsel had raised the claims, there is a reasonable probability the outcome of the appeal would have been different." Taylor v. State , 262 S.W.3d 231, 253 (Mo. banc 2008).
Appellate counsel testified, although she was familiar with the proportionality review statute and raised this issue in prior briefs, she made a conscious decision in Movant's case to forego raising this claim on direct appeal. Appellate counsel explained she never prevailed when raising this issue in the past, she was frustrated with the way this Court analyzed the issue, and she did not anticipate this Court would start examining "non-death" similar cases until issuing its decision in Deck . The effectiveness of counsel is "measured by what the law is at the time of trial." Hoeber v. State , 488 S.W.3d 648, 658 (Mo. banc 2016). "Counsel will generally not be held ineffective for failing to anticipate a change in the law." Glass , 227 S.W.3d at 472.
Even if appellate counsel was ineffective for failing to brief the issue, Movant has not demonstrated he suffered prejudice. This Court undertook its independent duty to conduct proportionality review pursuant to section 565.035.3 in Anderson I and Anderson III . Proportionality review was the subject of much debate in Anderson III as evidenced by the separate opinions filed. After this Court issued Deck , appellate counsel filed a lengthy motion for rehearing in Movant's case, requesting this Court reexamine its decision in his case. Movant failed to demonstrate the outcome of the appeal would have been different had appellate counsel raised a proportionality argument on appeal. The motion court did not clearly err in denying this claim.
*618 Conclusion
The motion court did not clearly err in overruling Movant's Rule 29.15 motion for post-conviction relief after an evidentiary hearing. The motion court's judgment is affirmed.
All concur.

This Court refers to some of the individuals by their first names because many share the same last name. This Court intends no familiarity or disrespect.

This recitation incorporates portions of this Court's prior opinions from Movant's four prior appeals without further attribution or citation.

All statutory references are to RSMo 2000 as supplemented through 2016.

Hutchison was overruled on other grounds by Mallow v. State , 439 S.W.3d 764, 770 n.3 (Mo. banc 2014).

Davis-Kerry's testimony at the current hearing about pursuing a different trial strategy was not focused on Smith's testimony. Although Davis-Kerry had some uncertainty about Smith's testimony from Anderson I , she stated, "Our theory was that what was done in the first trial was not effective ... we looked at a lot of the mental health evidence that had been developed and it was our plan to try to pare that down." Later, Davis-Kerry testified, "Because all of the other times had not been persuasive ... the first trial had not been persuasive, the information that came out in the PCR had not been persuasive so we decided this time we were going to try something different." Davis-Kerry offered this explanation in connection with having Movant testify to show remorse for the murders, not about presenting Smith's testimony.

Earline died before the most recent hearing occurred. The parties offered into evidence Exhibit GG, containing Earline's testimony. The state stipulated the statements contained therein would comprise Earline's testimony, but did not stipulate to their veracity.

Exhibit AA, a memorandum from the public defender's file, memorializes Jones' statement.

Dionne testified during Anderson IV . The motion court took judicial notice of all of the testimony from that hearing.

Stovall testified during Anderson IV . The motion court took judicial notice of all of the testimony from that hearing.

Woods testified during Anderson IV , but died before the most recent hearing. The motion court took judicial notice of all of the testimony from that hearing and a report generated by him.