

# Missouri Court of Appeals
## Southern District

### In Division

MARTIN PRIEST, )
　　　　　　　　　　　　　　　 )
　　　Movant-Appellant, )
　　　　　　　　　　　　　　　 )
v. 　　　　　　　　　　　　　　 )　　No. SD38062
　　　　　　　　　　　　　　　 )　　Filed: August 20, 2025
STATE OF MISSOURI, 　　　 )
　　　　　　　　　　　　　　　 )
　　　Respondent-Respondent. )

APPEAL FROM THE CIRCUIT COURT OF LACLEDE COUNTY

Honorable Aaron G. Koeppen, Circuit Judge

**<u>AFFIRMED</u>**

　　　Martin Priest (Movant) appeals from an order denying his amended Rule 29.15 motion to set aside his conviction for first-degree murder for strangling and killing a 15-year-old victim (Victim) in 1984.  *See* § 565.003 RSMo (1978).[1]  Because the motion court's decision to deny relief after an evidentiary hearing was not clearly erroneous, we affirm.

---

[1]  The crime of first-degree murder under the criminal code in place at the time of the alleged crime, § 565.003 RSMo (1978), was similar to what would be the crime of second-degree felony murder today, pursuant to § 565.021 RSMo (2016).  *See* **State v. Priest**, 585 S.W.3d 397, 398 n.1 (Mo. App. 2019).  All references to rules are to Missouri Court Rules (2024).

Movant bore the burden of proving the grounds asserted in his post-conviction motion by a preponderance of the evidence. *See* Rule 29.15(i); *McLaughlin v. State*, 378 S.W.3d 328, 337 (Mo. banc 2012). Our review of the denial of a Rule 29.15 motion is limited to determining whether the motion court's findings of fact and conclusions of law are "clearly erroneous." Rule 29.15(k); *Flaherty v. State*, 694 S.W.3d 413, 416-17 (Mo. banc 2024).

> [A]n appellate court can overrule the motion court's judgment after an evidentiary hearing if it is based on: (1) a mistake of law, (2) a factual finding for which there was insufficient evidence, or (3) a factual finding for which there was sufficient evidence but which the appellate court, nevertheless, finds was clearly erroneous, i.e., the appellate court on the whole of the evidence is left with a definite and firm conviction that a mistake has been committed.

*Flaherty*, 694 S.W.3d at 418 (internal footnote omitted).

"This Court presumes that the motion court's findings are correct." *Barton v. State*, 432 S.W.3d 741, 748 (Mo. banc 2014). An appellate court also "defers to the motion court's superior opportunity to judge the credibility of witnesses." *Shockley v. State*, 579 S.W.3d 881, 892 (Mo. banc 2019) (internal quotation marks and citations omitted). The motion court is "entitled to believe all, part, or none of the evidence presented at the post-conviction hearing." *State v. Hunter*, 840 S.W.2d 850, 863 (Mo. banc 1992). The evidence at trial is viewed in the light most favorable to the verdict. *State v. Lammers*, 479 S.W.3d 624, 632 (Mo. banc 2016); *State v. Smith*, 679 S.W.3d 599, 601 (Mo. App. 2023). The following summary of facts has been prepared in accordance with these principles.

Movant was charged by a second-amended information with first-degree murder for causing Victim's death by strangling her, and that he did so while raping her, or after the rape to prevent detection. The charge arose from events that occurred in May 1984, when Victim disappeared. Over 30 years later, Movant's nephew (Nephew) came forward and

implicated Movant. Following a jury trial in October 2018, the jury found Movant guilty as charged. Viewing the evidence favorably to the jury's verdict, as we must, the following facts were adduced at trial.

In May 1984, Victim was 15 years old and lived in Eldon, Missouri, with her mother (Mother) and older brother (Brother). At the time, Mother had been dating Movant for a few months.

Nephew was then 13 years old. He was nearly six feet tall, had "scraggly" hair, and was described as looking Native American. Nephew was living in his maternal grandmother's home in Eldon, Missouri. His mother, older brother, and younger siblings had also lived in the home periodically, before moving to a trailer home in Osage Beach, Missouri. According to Nephew, his mother "jumped around," and moved in and out of his grandmother's home "on several different occasions." Nephew and his older brother previously lived in Wichita, Kansas, with their paternal grandparents. Nephew had been enrolled in school in Eldon, but he "hardly ever went to school[.]" Nephew also knew Victim. She befriended Nephew after she helped Nephew and his older brother avoid a fight with other teenagers after school.

In the early morning of May 16, 1984, Movant borrowed Brother's car, a two-door blue Buick Skylark, because Victim had an accident in Movant's vehicle the previous day. Movant first drove to Nephew's grandmother's home where Nephew was staying. Movant picked up Nephew and they drove toward the high school in Eldon, where Victim was a student.

Victim was with her friend (Friend) smoking a cigarette in front of the school before school started. Around 7:40-7:45 a.m., Movant and Nephew drove up in a blue car. Movant told Nephew to ask Victim to come with them and skip school and motioned for Victim to

approach the car. Victim told Friend she would be right back and walked to the car. Victim seemed nervous, but later told Nephew that she decided to get into the car because Nephew was also in it. Nephew stepped out of the car to let Victim into the back seat, and the car drove away. After driving for a little while, Movant stopped at a gas station to buy a drink.

After returning from the gas station, Movant drove out of town and turned onto a gravel road that Nephew did not recognize. Victim became uneasy and told Movant that she wanted to go back to school. Movant pulled over and said that he needed to go to the restroom. Victim became more uneasy and continued begging Movant to take her back to school. Movant exited the vehicle and looked around.

Victim then told Nephew that she needed to use the restroom, and Victim and Nephew exited the vehicle. As soon as she got out of the car, Victim fled. Movant screamed at Nephew, "What the hell's wrong with her? … Go get her!" Nephew chased after Victim, who eventually stopped after hopping a fence. Nephew asked Victim what was wrong, and, frightened, Victim told him, "I'm not getting back in the car." Nephew calmed Victim down and convinced her to return to the car.

Once they returned, Movant told Nephew to get in the back seat, and Victim sat in the front seat. Movant proceeded down the gravel road and began arguing with Victim about Movant's wrecked vehicle, telling her, "don't try to lie to me." Victim responded that if Movant had a problem, they could discuss it with Mother. Movant turned the car around before stopping again.

Movant turned to Nephew and informed him that he knew Nephew and Victim were in a relationship and suggested that Nephew and Victim have sex in the back seat of the car while he watched. Because Nephew had been groomed by family members to have sex in

4

front of them, he felt that he needed to do what Movant asked. Victim also seemed to feel that she needed to obey Movant to get through the situation.

After Victim and Nephew had sex, Movant told Victim to get back in the front seat. Once Victim was in the front seat, Movant dropped an item onto the floorboard and asked Victim to pick it up. As Victim was reaching down for the item, Movant struck Victim on the back of the head with a wrench. When Nephew tried to intervene, Movant hit him. Nephew cowered behind the seat to avoid being hit again.

Movant then raped Victim while Victim screamed, "no," and he strangled her to death.

After murdering Victim, Movant drove Nephew and Victim's body to Nephew's mother's trailer home. As they were driving, Movant told Nephew that if he ever told anyone what happened, Nephew would be in as much trouble as Movant. Then, Movant and Nephew carried Victim's body into the trailer and into Nephew's sisters' bedroom. Nephew's mother, older brother, and younger siblings were all home. Movant tried to keep everyone out of the bedroom, but Nephew's older, then 14-year-old brother was able to get inside and saw Victim's body. Nephew's mother also saw Victim's body.

Movant left to go to see his sister-in-law (Sister-in-law) at her house. He arrived between 9:00 and 9:30 a.m. and asked to borrow her shovel. Sister-in-law remembered the time because that was when she typically got ready for her work shift that began at 10 a.m. She was confused at first seeing a blue car, and then surprised to see it was Movant, because the car was not his and it was unusual for Movant to visit, especially early in the morning. Movant said he was going fishing and needed the shovel to dig for worms. Movant took the shovel but left the nearby can used to collect the worms. He returned about 20 minutes later and said the ground was too hard to dig. Movant then went into Sister-in-law's house and

5

told her that he had a check that Mother had written to him that morning and he needed to cash it. He wanted Sister-in-law to call the bank to find out if there was enough money in the bank to cover the check, but Sister-in-law told Movant to make the call himself because she had to get ready for work. Movant also wanted Sister-in-law to fill out the check for him, but Sister-in-law refused.

When Sister-in-law was ready for work, she told Movant that she was low on gas and needed him to follow her into town. Sister-in-law was not actually low on gas and only told Movant that because she did not want to leave him there with her sister and her daughter, who was sick that day. Movant then told Sister-in-law that they were going to have to take "the back road" into town. When Sister-in-law asked why, Movant explained that he was supposed to be at work and he might be seen by Brother, who would tell Mother he was not at work. Before they left, Sister-in-law called her work to let them know that she was going to be a bit late, and she believed that she and Movant left the house around 9:50 a.m.

Later that day, Movant returned to Nephew's mother's trailer home in a white truck carrying a 50-gallon steel drum and shovels. Movant told Nephew to come with him, and they placed Victim's body in the drum and drove to an unfamiliar area. When the vehicle stopped, Nephew tried to flee, but later came back after he realized he was lost and had no transportation home.

Movant and Nephew rolled the steel drum containing Victim's body into a depression in the ground and covered it with dirt. Movant told Nephew that if Nephew ever said anything about the murder, Nephew and his family would all be in trouble. Later, while drinking beer with Nephew, Movant again warned Nephew to never tell anyone what happened or he "could end up in that hole" with Victim. Nephew convinced Movant to let him live by promising never to tell anyone what occurred.

6

When Victim did not return home from school, Mother became worried and went to Eldon Park to look for her. When she could not find Victim, she contacted the Eldon police.

A few days later, Movant contacted Mother and told her that he believed Victim had run away. Movant later told Mother that she would never find Victim without him and that he had hidden Victim somewhere. Movant stated, "The only way you're going to see your daughter again is through me[.]" Mother became frightened by Movant and promised to stay with him while they searched for Victim. Mother asked Movant for proof that he had kidnapped Victim, but he did not provide any proof. After Movant told Mother that he had kidnapped Victim, Mother told police what he said. At their request, Mother kept a diary and wrote down any information Movant told her. She tried to get more information about Victim's whereabouts from Movant, but he refused to tell her.

Around this time, Movant told his ex-girlfriend (Ex-girlfriend) to lie to police on his behalf. Ex-girlfriend obeyed because she was afraid of Movant. She told police that she saw Victim on June 7, 1984. She later confessed to police that Movant threatened her and made her lie to "throw the Police Department off his trail."

In 2008, about 24 years later, the Eldon Police Department employed Detective Brian Kidwell (Det. Kidwell) as an investigator and assigned him Victim's case.[2] Det. Kidwell became interested in identifying the passenger of the car Victim entered when she disappeared because no one had been able to do so at the time. Det. Kidwell interviewed Friend, who provided information that led Det. Kidwell to peruse school records and to contact the local juvenile office. He was then able to present Nephew's picture to Friend in a photo lineup consisting of six adult male individuals. Friend identified the photo of Nephew as the passenger in the car.

---

[2] At the time of trial, Det. Kidwell was the Chief of the Eldon Police Department.

Det. Kidwell then located Nephew at the Norton Kansas Correctional Facility. Nephew initially refused to help, but once his mother passed away and he knew that she and his brother could not be implicated in the crime, he agreed to help. The detective brought Nephew to Missouri and had Nephew navigate the route of travel surrounding the crime. The entire route took approximately one hour and 20 minutes to complete, which was consistent with the time frame given by witnesses who testified as to Movant's whereabouts at trial. Det. Kidwell and other investigators searched for Victim's body in the place Nephew believed it was buried, but were unable to locate the body, or determine if it had been removed, or determine if the elements had eliminated the body and its placement. Victim's body was never found.

Those testifying for the State included Nephew and witnesses who corroborated aspects of his testimony, including Victim's Brother, Friend, and Nephew's older brother. Victim's Brother corroborated Nephew's testimony that Movant borrowed Brother's blue car the day Victim disappeared. Similarly, Friend also corroborated Nephew's testimony that when the blue car arrived at Victim's school, two occupants were in the vehicle. The driver was "dark-headed." The passenger, who had "scraggly hair" and "looked like an Indian[,]" got out of the car to let Victim in. Victim told Friend she would be right back and got into the back seat. Years later, Friend identified Nephew in Det. Kidwell's photo lineup as the passenger in the blue car that day. Nephew's brother testified that he, like Nephew, "stayed away from school" and was home that day when he saw Victim's body. When Movant learned of this, Movant grabbed Nephew's brother and told him if he knew what was good for him, he would "keep [his] mouth shut." Like Nephew, his brother kept quiet for years to protect the family.

Apart from Nephew and those corroborating aspects of his story, other State's witnesses who provided damaging testimony against Movant included Mother, Ex-girlfriend, and Sister-in-law. These witnesses in particular were afraid of Movant. Mother testified, *inter alia*, that after Movant told her that he had kidnapped Victim, he said Mother would never find Victim without him. Mother was scared that something was going to happen to Victim if she didn't do what he said. Likewise, Ex-girlfriend was afraid of Movant. He threatened her if she did not do as she was told and lie for him. Sister-in-law testified that she did not want to leave Movant alone with her sister and daughter, and further detailed Movant's strange behavior that day, including his insistence that they take "the back road" into town.

The theory of the defense was to attack Nephew's credibility. In addition, Movant waived his Fifth Amendment rights and took the stand to testify on his own behalf.

The jury found Movant guilty of first-degree murder. Movant was sentenced to life imprisonment, with the sentence to run consecutively to a sentence in Kansas for a different conviction. This Court affirmed Movant's conviction and sentence in **State v. Priest**, 585 S.W.3d 397 (Mo. App. 2019). Our mandate issued October 24, 2019.

Movant filed an original motion seeking post-conviction relief pursuant to Rule 29.15. Thereafter, appointed counsel filed an amended motion.[3] In the amended motion, Movant presented several claims of ineffective assistance of trial counsel, including that his trial counsel was ineffective for: (1) failing to impeach Sister-in-law's testimony with her prior inconsistent statement to law enforcement that Movant arrived at her house an hour earlier than she stated at trial; (2) failing to exclude Friend's identification of Nephew

---

[3] This Court has independently verified the timeliness of Movant's post-conviction motions. *See* **Moore v. State**, 458 S.W.3d 822, 825-26 (Mo. banc 2015); **Dorris v. State**, 360 S.W.3d 260, 268 (Mo. banc 2012).

9

because it happened after she had undergone hypnosis; and (3) failing to impeach Nephew's testimony with evidence that he was not in Eldon the day of Victim's disappearance because school records from Wichita show he was enrolled there in May 1984.

In January 2023, an evidentiary hearing was held on the amended motion. Those testifying included Movant's trial counsel, James Willis (Trial Counsel). The motion court took the matter under advisement. Thereafter, the court denied all claims for post-conviction relief. This appeal followed. Additional facts will be included below as we discuss Movant's three points on appeal.

Movant's three points contend that the motion court clearly erred in denying his claim because Trial Counsel was ineffective. To obtain post-conviction relief based on a claim of ineffective assistance of trial counsel, a movant must satisfy the two-pronged test announced in *Strickland v. Washington*, 466 U.S. 668 (1984). *See Anderson v. State*, 564 S.W.3d 592, 600 (Mo. banc 2018). *Strickland* requires a movant to prove: (1) deficient performance by counsel; and (2) prejudice as a result of that deficient performance. *Strickland*, 466 U.S. at 687. Deficient performance is measured in terms of "reasonableness under prevailing professional norms." *Id*. at 688. Because of the difficulties inherent in making this evaluation, a movant must overcome a strong presumption that counsel's conduct was reasonable and effective. *Id*. at 689; *see Zink v. State*, 278 S.W.3d 170, 176 (Mo. banc 2009). Prejudice requires a showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Anderson*, 564 S.W.3d at 601. Both of these prongs must be proven in order to establish ineffective assistance of counsel. *Zink*, 278 S.W.3d at 175. "If the movant fails to satisfy either the performance or the prejudice prong of the test, then we need not consider the other[,] and his claim of ineffective assistance of counsel

10

must fail." *Anderson v. State*, 66 S.W.3d 770, 775 (Mo. App. 2002); *Blade v. State*, 685 S.W.3d 633, 638 (Mo. App. 2024).

*Point 1*

Movant's first point contends the motion court clearly erred in denying his claim that Trial Counsel was ineffective when he failed to impeach Sister-in-law's testimony with a prior inconsistent statement that Movant arrived at her home an hour earlier than she testified to at trial. The State's case-in-chief was based on a tight timeline during which the murder could have taken place. The timeline worked only if Movant arrived at Sister-in-law's house as she testified at trial – between 9:00 and 9:30 a.m. The following facts are relevant to this point.

At the evidentiary hearing, Movant called Curtis Bryant, a special agent with the FBI (Agent Bryant), who began working on the case in 2006. In August 2007, over 23 years after Victim's disappearance, Agent Bryant interviewed Sister-in-law. She told Agent Bryant that Movant arrived at her house earlier on the morning of May 16, 1984 – between 8:00 and 8:30 a.m. When Movant returned the shovel, he left it on the porch and came into the house for a time. Movant questioned Sister-in-law about when the bank opened and requested that she call the bank for him. During the time Movant was at her house, he watched a game show on television and yelled about "whammies." After the interview with Sister-in-law, Agent Bryant did some research on a game show that used the term "whammies" called "Press Your Luck." The agent learned it aired in Eldon at both 8:30 and 9:30 a.m. on different channels.[4]

As mentioned previously, Sister-in-law testified at trial that Movant arrived at her home between 9:00 and 9:30 a.m. while she was getting ready for work. Sister-in-law also

___

[4] A "TV Guide" for the relevant date showed the game show aired at both times.

11

testified that she rarely saw Movant and it was highly unusual for him to visit so early in the morning. After Movant returned with the shovel, he began "pestering" Sister-in-law to call the bank for him to learn how much money was in the account, so he could cash a check Mother had given him. He also "kept trying to get [Sister-in-law] to fill out the check for him."

Movant provided contrary testimony at trial. Movant did not specify when he arrived at Sister-in-law's house, but testified generally that he went there that morning "to dig some worms" to fish, and that he had done so "[m]any times." He talked with Sister-in-law on her porch when he returned with the shovel and left within "ten minutes" to go fishing by himself all day. Movant did *not* testify that he: (1) went inside Sister-in-law's home; (2) asked her about calling the bank; or (3) watched a television game show. After fishing until about 1:30 p.m., Movant testified that he drove back into town, saw Victim with some friends at the park, cashed the check from Mother, left the state and sold his vehicle on his way to Kansas to stay with family. He returned to Eldon a few days later.

At the evidentiary hearing, Trial Counsel recalled that Sister-in-law testified at trial that Movant arrived at her home at 9:00 or 9:30 a.m., but had also told Agent Bryant in 2007 that Movant arrived between 8:00 and 8:30 a.m. Trial Counsel agreed he could have impeached Sister-in-law with this prior inconsistent statement and did not have a strategic reason for not doing so. Trial Counsel was also aware that the game show "Press Your Luck" aired at both 8:30 and 9:30 a.m. on May 16, 1984.

As relevant here, Movant's amended motion claimed, *inter alia*, that Trial Counsel was ineffective for failing to impeach Sister-in-law "with her prior inconsistent statements to law enforcement." Specifically, Movant argued:

> Counsel was ineffective for failing to call [Agent Bryant] as a rebuttal witness to [Sister-in-law's] testimony that [Movant] arrived at her house

12

between 9:00 and 9:30. Counsel also was ineffective for failing to present testimony from Agent Bryant that the show Press Your Luck came on television at 8:30 and at 9:30 a.m. in May of 1984.

The motion court found that Trial Counsel was not ineffective for failing to attack the State's timeline by calling Agent Bryant to testify that Sister-in-law told him in 2007 that Movant arrived at her house between 8:00 and 8:30 a.m. The motion court found:

> [Trial Counsel] was not ineffective in failing to call Agent Bryant … to testify concerning a statement [Sister-in-law gave 23 years] after the disappearance of the Victim in which [Sister-in-law] indicated she thought the Movant had arrived sooner than [she] testified to [at] trial.

The motion court further found that the failure to call Agent Bryant as a witness would not have changed the outcome of the trial because "Agent Bryant could confirm that the 'Press Your Luck' television show <u>was</u> also on during the State's timeline" (emphasis in original).

Point 1 contends the motion court clearly erred in denying this claim. According to Movant: (1) Trial Counsel was ineffective "when he failed to impeach [Sister-in-law] with her prior inconsistent statement because [that statement] made the State's timeline impossible, and, therefore, [Nephew] must have been lying"; and (2) "there is a reasonable probability the outcome of the trial would have been different because the State's case was weak in that it relied almost entirely on [Nephew's] credibility, and this testimony would have raised doubt in the juror's minds about the State's timeline and [Nephew's] credibility." We disagree with both arguments.

"This Court presumes that counsel's decision not to impeach a witness is a matter of trial strategy." *Barton v. State*, 432 S.W.3d 741, 751 (Mo. banc 2014). In addition, "the selection of witnesses and the introduction of evidence are questions of trial strategy and virtually unchallengeable." *State v. Kenley*, 952 S.W.2d 250, 266 (Mo. banc 1997); *Johnson v. State*, 333 S.W.3d 459, 463-64 (Mo. banc 2011). "Even if counsel cannot recall why he made a particular decision, a court may properly find that the challenged action was

13

the result of a reasonable trial strategy if such a strategy appears from the record or from other evidence in the case." ***Rothman v. State***, 353 S.W.3d 400, 403 (Mo. App. 2011). "The question in an ineffective assistance claim is not whether counsel could have or even, perhaps, should have made a different decision, but rather whether the decision made was reasonable under all the circumstances." ***Shockley v. State***, 579 S.W.3d 881, 898 (Mo. banc 2019) (citations omitted). Thus, in proving that counsel was ineffective for failing to impeach a witness, a movant has the burden of showing that the impeachment "would have changed the outcome of the trial, and [a movant] must also overcome the presumption that counsel's decision not to impeach was a matter of trial strategy." ***State v. Phillips***, 940 S.W.2d 512, 524 (Mo. banc 1997); *see **Barton***, 432 S.W.3d at 750.

Here, Movant failed to overcome the presumption that Trial Counsel provided effective assistance. As an initial matter, if Trial Counsel had tried to impeach Sister-in-law with her prior inconsistent statement and evidence that the game show she recalled Movant watching aired at 8:30 and 9:30 a.m., Trial Counsel very well could have *confirmed* the State's timeline for the jury, if jurors believed that the show Movant watched was the game show that aired at the later time. Notably, at trial, Sister-in-law remembered the later time period because that is when she typically got ready for a work shift starting at 10 a.m. "Missouri courts have repeatedly held that an attorney is not ineffective for deciding not to introduce evidence that is harmful to the defense as well as helpful." ***Rothman***, 353 S.W.3d at 403; *see **Clayton v. State***, 63 S.W.3d 201, 208 (Mo. banc 2001).

In addition, the jury could have dismissed Sister-in-law's statements to Agent Bryant as her failing to recall the timeline accurately when interviewed about the day over 23 years later. *See, e.g.*, ***Barton***, 432 S.W.3d at 752 ("[b]ecause of the passage of time, it is reasonable to expect that minor details of the events of that day will be forgotten or

14

remembered slightly different"). This is particularly true in this case, given the many years between the 1984 murder, Sister-in-law's 2007 interview with Agent Bryant, and the 2018 trial.

Further, Sister-in-law's version of events was very different than Movant's version of events. She testified Movant rarely visited, that he came into her house that day and watched a game show while "pestering" her about Mother's check. Movant, on the other hand, testified that he went "many times" to Sister-in-law's house, and that he talked with her only on her porch and left ten minutes after returning the shovel. By impeaching Sister-in-law's testimony, Trial Counsel would be asking the jury to find Sister-in-law credible in several respects (Movant entering her home, watching a game show) – a strategy that would necessarily undermine Movant's own testimony. "It is not ineffective assistance of counsel to pursue one reasonable trial strategy to the exclusion of another reasonable trial strategy." *Anderson v. State*, 196 S.W.3d 28, 33 (Mo. banc 2006). "Reasonable choices of trial strategy, no matter how ill-fated they appear in hindsight, cannot serve as a basis for a claim of ineffective assistance." *Id*.; *see McLaughlin*, 378 S.W.3d at 337.

Thus, while Trial Counsel could have used evidence from Agent Bryant to attempt to impeach Sister-in-law, counsel's failure to do so was not unreasonable under the circumstances. *See Shockley*, 579 S.W.3d at 898. Further, impeachment would not have changed the outcome of trial because of the two times that the game show aired. Moreover, strong evidence of Movant's guilt also came from Mother, Ex-girlfriend, and Sister-in-law – not only from Nephew. For all these reasons, the motion court did not clearly err in denying this claim. Point 1 is denied.

Movant's second point contends the motion court clearly erred in denying Movant's claim that Trial Counsel was ineffective by failing to exclude Friend's identification of Nephew because it was "the product of hypnosis[.]" The following facts are relevant to this point.

At trial, Friend testified that she was smoking a cigarette with Victim near the school at around 7:45 a.m., when a blue car drove up. Victim got inside after the driver waved her over, and the passenger got out of the front passenger seat to let Victim in. Friend said in 1984 that the driver had dark hair and that the passenger had "scraggly" hair and "looked like an Indian" to her. Victim got into the back seat, and that was the last time Friend saw her. Friend was questioned either later that day or week by the police chief, and she testified that "at that time" she relayed the information to him that she testified to at Movant's trial.

At some point after Victim went missing, Mother hired a private investigator, who had Friend undergo hypnosis to retrieve her memory of the date Victim disappeared. Years later, after Det. Kidwell began his investigation, Friend viewed a photo lineup in 2008 and identified Nephew as the passenger in the blue car that day. The photo of Nephew depicted him as a grown man and not a 13-year-old boy as he was in 1984. From that identification, the detective located Nephew and continued his investigation.

Movant's amended motion claimed that Trial Counsel provided ineffective assistance due to his "failure to investigate and move to exclude [Friend's] post-hypnotic testimony and her tainted identification of [Nephew.]"

The motion court disagreed. The court found that this claim failed for several reasons, because: (1) Friend only identified Nephew, not Movant; (2) Nephew confirmed her identification; (3) though hypnosis was mentioned, it was uncertain whether it actually

16

occurred; (4) there was no evidence that hypnosis prompted Friend to identify Nephew; and (5) while crucial to the investigation, her identification was not crucial at trial. The court explained:

> In reviewing this Claim, and the evidence presented at trial, it is very true that the testimony of [Nephew] was significant. But [Friend's] identification of [Nephew] as the other person in the Movant's car was not. Movant is correct that Missouri's law does not permit the admission of eyewitness identifications based on hypnosis. *Alsbach v. Bader*, 700 S.W.2d 823 (Mo. Banc 1985); *State v. Blackman*, 826 S.W.2d 76 (Mo. App. E.D. 1992). But, it is significant in resolving this Claim in the Amended Motion that [Friend's] identification of [Nephew] as the passenger was verified by [Nephew]. Movant's [Trial Counsel] established that [Nephew] initially refused to speak to the police, denied any involvement in the crime when he did speak to the police, and only later gave a detailed account of the rape and murder. [Friend] did not identify Movant at any point in the trial. She identified [Nephew] – who confirmed the accuracy of [her] identification.
>
> There are several factors of significance in this Court's analysis of Movant's claim. While there is mention of hypnosis during the 2006 interview, the Court remains uncertain whether that did, in fact, occur. And there certainly is no evidence to indicate the witness was prompted to identify any particular individual. Second, the reality is that [Friend's] identification of [Nephew] was crucial to the criminal investigation, but not to the trial itself. The identification lead, eventually, to [Nephew] being located as the eyewitness to the murder and rape of the Victim. But, at trial, it was the credibility of [Nephew's] testimony that resulted in a conviction, not whether [Friend] accurately identified [Nephew].

Point 2 contends the motion court clearly erred in denying this claim. According to Movant: (1) Trial Counsel was ineffective for failing "to file a pretrial motion to exclude [Friend's] identification of [Nephew] because it was the product of hypnosis"; and (2) there is a reasonable probability the outcome of the trial would have been different "if the identification was excluded because the State's case was weak and relied almost entirely on [Nephew's] credibility, and this testimony would have raised doubt in the juror's minds about [Nephew's] credibility[.]" We disagree.

17

Here, Movant failed to show any prejudice. We are unpersuaded by Movant's argument that Friend's identification of Nephew "would have raised doubt in the juror's minds about [Nephew's] credibility" when Nephew, himself, confirmed that he was, in fact, the passenger in the blue car that day. There is no reasonable likelihood that, had Friend's identification been excluded, the outcome of the trial would have been different. *See Anderson*, 564 S.W.3d at 601. Similarly, Friend's identification was also cumulative of other properly admitted evidence, and as such, "cannot have contributed to a defendant's conviction and is harmless beyond a reasonable doubt." *State v. Garner*, 670 S.W.3d 262, 266 (Mo. App. 2023); *see State v. Brandolese*, 601 S.W.3d 519, 536 (Mo. banc 2020) ("[a] complaining party is not entitled to assert prejudice if the challenged evidence is cumulative to other related admitted evidence"). Thus, Trial Counsel was not ineffective for failing to file a meritless motion to exclude Friend's identification. *See Morris v. State*, 675 S.W.3d 208, 213 (Mo. App. 2023) (counsel cannot be found ineffective for failing to file a meritless motion); *Harden v. State*, 415 S.W.3d 713, 719 (Mo. App. 2013) (same holding). Accordingly, the motion court did not clearly err in denying this claim. Point 2 is denied.

*Point 3*

Movant's third point contends the motion court clearly erred in denying Movant's claim that Trial Counsel was ineffective for failing to impeach Nephew with evidence that he was not in Eldon on the date Victim disappeared, based on school records showing that he was enrolled in school in Wichita at the time. The following facts are relevant to this point.

Movant's amended motion claimed that Trial Counsel provided ineffective assistance due to his "failure to investigate and present evidence that [Nephew] was not in Eldon, Missouri on May 16, 1984."

18

At the evidentiary hearing, Trial Counsel testified that he was aware that Nephew initially told law enforcement that he lived in Eldon for a very short period of time in March or April of 1984 before he moved to Wichita to live with his paternal grandparents. Trial Counsel was further aware of Nephew's school records showing that he began the 1983-84 school year in Wichita on August 29, 1983. Nephew was enrolled in Eldon public schools starting in December of 1983, but he transferred back to a junior high school in Wichita on March 15, 1984. There was another exit date recorded from that school on September 10, 1984. The records also indicated that Nephew took a standardized test in Wichita in April 1984. His school attendance in Wichita for the 1983-84 school year showed 86 days present and 37 days absent, but did not indicate which days he was present or absent.[5] Nothing in the records, however, confirmed that Nephew was not in Eldon on May 16, 1984. While aware of the records, Trial Counsel did not present this evidence at trial.

The motion court denied this claim of ineffective assistance. The court found that Trial Counsel was not ineffective for failing to present Nephew's school records during trial because the records did not conclusively show he was or was not in Eldon, Missouri on May 16, 1984. The court stated:

> Reviewing [these] records does not provide any discernable information from which Movant could make a credible argument that [Nephew and his brother] were attending school, or otherwise in Wichita, Kansas on May 16, 1984. The quality and clarity of the records make them essentially illegible and offer no credible impeachment of the evidence that the brothers were living in Eldon, with their mother, at the time of the murder.

---

[5] In addition to school records, there was a missing-persons report filed with Eldon police by Nephew's maternal grandmother on February 13, 1984, indicating that her daughter, Nephew's mother, was missing along with her children. A note in that file indicated police in Wichita, Kansas confirmed that Nephew and his brother were in Wichita living with paternal grandparents on March 10, 1984.

The court therefore concluded that Trial Counsel was not ineffective for failing to present this evidence to the jury.

Point 3 contends the motion court clearly erred in denying this claim. According to Movant: (1) Trial Counsel was ineffective for failing to impeach Nephew "with his school records and police reports, which indicated he was likely in Wichita on May 16, 1984"; and (2) "there is a reasonable probability that the outcome of the trial would have been different because the State's case was weak and relied almost entirely on [Nephew's] credibility, and this testimony would have raised doubt in the juror's minds about the State's timeline and [Nephew's] credibility." Again, we disagree.

Here, Movant failed to overcome the presumption of reasonable trial strategy. The record demonstrates that Trial Counsel strategically chose to impeach Nephew's credibility through a variety of other methods, including: (1) cross-examining Nephew and other witnesses on his inconsistent statements; (2) attempting to demonstrate the impossibility of Nephew's timeline of events the day of the murder; and (3) impeaching Nephew with his past convictions and pending charges at the time he first told law enforcement he had information about the case. Further, evidence established early on that Nephew's mother and children moved in with their maternal grandmother in Eldon on several occasions, and that both Nephew and his brother stayed away from school. Indeed, Nephew and his brother both testified that, on the day of Victim's disappearance, they were not in school. Nephew also said that he and Movant encouraged Victim to skip school that day. Given the number of absences reflected by the school records, the fact that Nephew was enrolled in school in Wichita does not mean he was there in school on the day in question. Therefore, Trial Counsel exercised reasonable trial strategy in selecting other methods of impeaching Nephew's credibility to the jury instead of presenting his school records, which did not

20

clearly refute his testimony that he was in Eldon with Movant on the day of the murder. *Anderson*, 196 S.W.3d at 33 (holding counsel is not ineffective for pursuing one trial strategy to the exclusion of another).

Thus, the record from Movant's trial and the record made following trial at the evidentiary hearing both support the motion court's findings and demonstrate that Trial Counsel exercised reasonable trial strategy in reviewing the evidence in Movant's case and developing a reasonable trial theory attacking the strongest evidence against Movant. "Counsel will not be deemed ineffective for reasonable choices of trial strategy no matter how ill-fated they may appear in hindsight." *Bracken v. State*, 453 S.W.3d 866, 872 (Mo. App. 2015). A strategy decision may serve as a basis for ineffective assistance of counsel only if the decision is unreasonable; the choice of one reasonable strategy over another is not ineffective assistance. *McLaughlin*, 378 S.W.3d at 337. The motion court's decision that Movant failed to overcome the presumption of reasonable trial strategy was not clearly erroneous. *Phillips*, 940 S.W.2d at 524. Point 3 is denied.

The motion court's order denying post-conviction relief is affirmed.


JEFFREY W. BATES, J. – OPINION AUTHOR

DON E. BURRELL, J. – DISSENTS IN SEPARATE OPINION

JENNIFER R. GROWCOCK, C.J. – CONCURS

21



# Missouri Court of Appeals
## Southern District

### In Division

MARTIN PRIEST,                          )
                                        )
      Movant-Appellant,         )
                                        )
v.                                      )    No. SD38062
                                        )    Filed:  August 20, 2025
STATE OF MISSOURI,                      )
                                        )
      Respondent-Respondent.    )

APPEAL FROM THE CIRCUIT COURT OF LACLEDE COUNTY

Honorable Aaron G. Koeppen, Circuit Judge

**<u>DISSENTING OPINION</u>**

I respectfully dissent.  On May 16, 1984, a teenage girl ("Victim") was sharing a cigarette with a schoolmate ("Schoolmate") around 7:45 a.m. on the grounds of Eldon High School as they were waiting for their classes to begin.  A car drove up to them, and Victim willingly entered the vehicle.

Schoolmate saw two individuals in the front seat of the car, but she was unable to identify them at the time.  Schoolmate was unable to get a clear look at the driver, only noting that he had dark hair.  Schoolmate did get a clear look at the passenger in the car, and she said he "looked like an Indian[,]" had "scraggly" hair, and looked to be in his 20s.

The car drove away, and apart from the two unidentified individuals in the front seat of that car, no one ever reported seeing Victim again.[1]

For over twenty years, law enforcement was unable to identify the man Schoolmate saw in the passenger seat of that car. But the case was finally reopened in 2008, when the Eldon Police Department employed Detective Brian Kidwell ("Detective") as an investigator and assigned him to work on Victim's case. Detective interviewed Schoolmate again, after she "went under hypnosis in order to retrieve her memories regarding what she saw in 1984[.]" Detective put together a photographic lineup of six adult men of a similar age and ethnicity to the description given by Schoolmate, and he showed it to Schoolmate, asking her if she "recognized anyone from that line-up being the passenger in that car that [Victim] got into that day." Schoolmate looked at the photographs (which she characterized as "mugshots") and answered, "Yes. No. 5."

The fifth photograph in the lineup was a picture, as an adult, of a nephew ("Nephew") of Martin Dean Priest, Sr. ("Movant"). After Schoolmate made that identification, law enforcement officers focused their efforts on interviewing Nephew, who was serving time in the Norton Kansas Correctional Facility. When Detective initially interviewed Nephew in the prison in 2010, Nephew said, "I don't know what you're talking about. You need to go. You know, I have no idea what you're talking about. Without an attorney, I'm not going to entertain this." In 2014, after Nephew's mother died, Nephew agreed "to tell them everything[.]" Nephew said that he was 13 years old on the day that Victim disappeared, and he eventually told Detective that he accompanied Movant when Movant killed Victim. On July 29, 2014, Detective, accompanied by

---

[1] The only exception was Movant's ex-girlfriend, who testified at trial that she had falsely reported to the police that she had seen Victim in June because Movant had asked her to lie for him.

Special Agent Curtis Bryant ("Agent Bryant"), and Missouri State Highway Patrol Sergeant Curt Mueller ("Sergeant Mueller"), transported Nephew from Kansas to Missouri to have Nephew take those officers "around the crime scene. The route of travel, if you will." Although Nephew took the officers to the place where he thought he and Movant had buried Victim's body, Victim's body was never found. Based upon what Nephew told Detective, Movant was charged with first-degree murder for killing Victim.

Movant's three-day jury trial took place in 2018. No forensic evidence was adduced, and the State's case relied largely upon the testimony that Nephew provided at trial. The jury found Movant guilty of first-degree murder, and the circuit court sentenced him to life imprisonment, running that sentence consecutively to a sentence Movant was serving in Kansas. We affirmed Movant's conviction on direct appeal in *State v. Priest*, 585 S.W.3d 397 (Mo. App. S.D. 2019).

In this appeal, Movant presents three points that claim the motion court clearly erred in denying his motion for postconviction relief because Movant demonstrated during his evidentiary hearing that his trial attorneys provided him with ineffective assistance of counsel ("IAC"). Finding merit in Movant's first and third points, I would vacate Movant's conviction and remand the cause for a new trial.

**Standard of Review**

"Appellate review of the trial court's action on the motion filed under this Rule 29.15 shall be limited to a determination of whether the findings and conclusions of the trial court are clearly erroneous." *Flaherty v. State*, 694 S.W.3d 413, 416 (Mo. banc 2024) (quoting Rule 29.15(k)).[2] "Appellate courts presume the motion court's findings are

---

[2] Unless otherwise stated, all rule references are to Missouri Court Rules (2024). We have independently verified the timeliness of Movant's *pro se* and amended motions under Rule 29.15. *See Moore v. State*, 458 S.W.3d 822, 825-26 (Mo. banc 2015).

3

correct and a 'judgment is clearly erroneous when, in light of the entire record, the court is left with the definite and firm impression that a mistake has been made.'" *Id.* (quoting *Davis v. State*, 486 S.W.3d 898, 905 (Mo. banc 2016)). "In applying this standard, appellate courts should defer to the motion court's superior opportunity to judge the credibility of witnesses and recognize the 'circuit court is entitled to believe all, part, or none of the evidence presented at the post-conviction hearing.'" *Id.* at 419 (quoting *Driskill v. State*, 626 S.W.3d 212, 220 (Mo. banc 2021), *modified and superseded on denial of rehearing August 31, 2021*). "When reviewing the denial of post-conviction relief, we interpret the facts 'in the light most favorable to the verdict.'" *McConnell v. State*, 688 S.W.3d 666, 673 (Mo. App. S.D. 2024) (quoting *Davis v. State*, 653 S.W.3d 169, 171 (Mo. App. S.D. 2022)). I discuss contrary evidence only to provide context for arguments set forth in the parties' briefs.

## Background

*Nephew's Interviews and Trial Testimony*

Detective first interviewed Nephew on March 6, 2010, at the Norton Kansas Correctional Facility, where Nephew was serving a 154-month sentence for robbery.[3] When Detective showed Nephew photographs of Victim, Nephew denied knowing anything about her. Detective returned for a second interview several months later and formally offered not to prosecute Nephew for any involvement he had in Victim's disappearance. Nephew maintained that he did not know Victim or anything about her disappearance.

---

[3] Nothing in the record indicates why law enforcement did not interview Nephew until 2010, two years after Schoolmate picked Nephew out in a photographic lineup in 2008.

In 2013, after having been released from prison on his robbery conviction, Nephew was arrested on a new charge. When law enforcement interviewed Nephew a third time in 2014, Nephew agreed to cooperate. Despite his promise to cooperate, Nephew gave varying accounts in subsequent interviews of what happened the day that Victim disappeared.

Nephew was the star witness at Movant's trial, during which he disavowed the statements that he originally made to Detective and provided the following testimony instead. Nephew told the jury that on the morning of May 16, 1984, Movant picked Nephew up from Nephew's grandmother's house, where Nephew was also living at that time. While driving past Eldon High School, they both saw Victim outside, and they asked her to skip school and come with them for the day. Victim knew Movant because Movant was in a romantic relationship with Victim's mother ("Mother"), and Nephew knew Victim because she had saved Nephew from a fight one day after school.

Victim willingly got into the back seat of the car. The trio then drove to a gas station for Movant to buy a drink. Next, Movant drove down a gravel road that was unfamiliar to Nephew. At that point, Victim became uneasy and asked to go back to the high school. Movant then stopped the vehicle to relieve himself. Victim said that she also needed to use the restroom, but instead of doing so, she fled from Movant and Nephew. After Victim ran away from the car, Nephew approached her and convinced her to return to the vehicle.

After Victim returned to the car, they continued further down the gravel road. Movant and Victim got into an argument about Movant's vehicle, which Victim had wrecked the previous evening.[4] After the argument, Movant turned the car around, then

_____

[4] Victim's brother testified that Movant had borrowed his vehicle the morning that Victim disappeared.

5

shortly stopped again. When they stopped, Movant demanded that Nephew and Victim have sex in the backseat of the car because Movant knew that Nephew and Victim had a relationship together. Nephew reluctantly complied, feeling a need to obey Movant to get out of the situation. Movant then told Victim to return to the front seat, where he raped Victim before strangling her to death.

Movant then drove to Nephew's mother's trailer home, where they carried Victim's body into a bedroom in the trailer. Although Movant tried to prevent them from seeing it, Nephew said that his brother, his sisters, and his mother saw Victim's dead body in the bedroom. Movant then left, and he did not return until after dark. When Movant returned, Nephew said that Movant had shovels and a steel 50-gallon drum in the back of a white pickup truck. Movant and Nephew then stuffed Victim's body into the drum and buried it in a rural area. Movant threatened Nephew that he would kill Nephew if Nephew ever told anyone about what had happened.

*Other Relevant Trial Testimony*

Movant's sister-in-law ("Sister-in-law") gave the following testimony at trial. Movant came to her house sometime between 9:00 a.m. and 9:30 a.m. on the morning that Victim disappeared. Sister-in-law remembered the time because that was when she typically got ready for her work shift that began at 10:00 a.m. Sister-in-law was surprised by Movant's visit as he did not come around often, and she thought it was unusual for him to be there. Sister-in-law told the jury that Movant came to dig for fishing worms, but Movant only grabbed the shovel without taking the worm can that he typically used when digging for worms. Movant walked to the back of Sister-in-law's property with the shovel, and he returned around 15 to 20 minutes later.

6

When Movant returned, he was "pestering" Sister-in-law about using her phone to call the bank to inquire about whether a check would clear or not. Sister-in-law continued to get ready for work while Movant watched the television show Press Your Luck. Once Sister-in-law was ready for work, she asked Movant to follow her into town for the reason that she was low on gas, which he did without issue. Sister-in-law told the jury that she intentionally misled Movant about being out of gas, as she just wanted Movant to leave her home.

*The Defense Strategy*

Movant's defense relied heavily upon cross-examination, especially of Nephew, and discrediting the State's witnesses at trial who testified (after having said nothing to authorities about it for 30 years) that Movant killed Victim and they saw her dead body before it was allegedly buried.[5] Trial counsel highlighted cross-examination testimony that Nephew initially denied involvement on several occasions, including when Nephew was offered a deal with prosecutors in exchange for his cooperation in Movant's case. Even when Nephew later acknowledged his involvement, his story changed often and significantly. For example, Nephew told law enforcement that the first time he and Victim had sex was in the backseat on the day of her disappearance. But in a subsequent interview, Nephew said that he and Victim had sex at least twice. Nephew also said that Victim was pregnant, but Victim was unsure as to whether Nephew was the father.

Nephew eventually told law enforcement that he and Movant took Victim's body to Nephew's mother's trailer home "behind the bait shop" in Osage Beach, but he also said at another point in the investigation that he and Movant left Victim's body inside the bait shop. During another interview, Nephew stated that they took Victim's body to his

---

[5] That testimony is set forth in the principal opinion and will not be repeated here.

7

grandmother's former house that was "[b]y the Bagnell Dam" and that Nephew was not involved in burying the body because he ran away from Movant.

In regard to Nephew's whereabouts at the time of the alleged murder, he first told law enforcement that he lived with his grandmother in Eldon. However, a few months later, Nephew stated that he lived in Rocky Mount, not Eldon, at the time of Victim's disappearance because Nephew's grandmother would not allow him to live with her. Nephew then later told officers that he lived with his grandmother at the time, but the rest of his family lived in Rocky Mount.

Movant testified at trial in his own defense, telling the jury that he did not kill Victim and that Nephew's testimony was a fabrication. Movant was 26 years old at the time of Victim's disappearance, and he was familiar with Victim because Movant was in a romantic relationship with Mother.

*The Postconviction Evidentiary Hearing*

At the evidentiary hearing on Movant's amended Rule 29.15 motion, trial counsel agreed that Sister-in-law testified at trial that Movant arrived at her house between 9:00 a.m. and 9:30 a.m. Trial counsel also admitted that he was aware of Sister-in-law's 2007 interview with the FBI, in which she told Agent Bryant that Movant had arrived at her home between 8:00 a.m. and 8:30 a.m. on the morning that Victim disappeared. Sister-in-law also said that Movant sat on her couch watching the show Press Your Luck as they waited for the bank to open at 9:00 a.m. A television guide disclosed by the State indicated that "Press Your Luck" aired at both 8:30 a.m. and 9:30 a.m. on different channels on the date of Victim's disappearance. When motion counsel asked trial counsel if he had "a strategic reason for not impeaching [Sister-in-law] with that prior inconsistent statement[,]" trial counsel responded, "No, I did not."

8

Trial counsel also agreed that whether Movant arrived at Sister-in-law's residence at 8:00 a.m. to 8:30 a.m. – versus 9:00 a.m. to 9:30 a.m. – made a "big difference as [to] whether [Nephew's] story was credible" based upon the State's theory that Movant and Nephew did all of the things that Nephew said happened between 7:45 a.m. and the time that Movant arrived at Sister-in-law's house that same morning. In other words, it was very unlikely that all of those things could have occurred before 9:30 a.m., but it would have been virtually impossible to complete them before 8:30 a.m.

**Analysis**

"To be entitled to postconviction relief for ineffective assistance of counsel, 'a movant must show by a preponderance of the evidence that his or her trial counsel failed to meet the *Strickland* test.'" ***Flaherty***, 694 S.W.3d at 420 (quoting ***Watson v. State***, 520 S.W.3d 423, 435 (Mo. banc 2017)). Under ***Strickland***, the movant must demonstrate that his "(1) counsel failed to exercise the customary skill and diligence a reasonably competent attorney would perform under similar circumstances; and (2) counsel's ineffective assistance prejudiced movant." ***McConnell***, 688 S.W.3d at 673 (citing ***Strickland v. Washington***, 466 U.S. 668, 687 (1984)).

*Point 1*

Movant's first point claims:

> The motion court clearly erred in denying [Movant]'s claim his attorney was ineffective for failing to impeach [Sister-in-law]'s testimony, because [Movant] received [IAC] . . . in that: (1) his trial counsel failed to act as [a] reasonably competent attorney would under the same or similar circumstances when he failed to impeach [Sister-in-law] with her prior inconsistent statement because [Sister-in-law]'s prior statement made the State's timeline impossible, and, therefore, [Nephew] must have been lying; and (2) there is a reasonable probability the outcome of the trial would have been different because the State's case was weak in that it relied almost entirely on [Nephew]'s credibility, and this testimony would have raised doubt in the juror's minds [sic] about the State's timeline and [Nephew]'s credibility.

9

I agree.

"The mere failure to impeach a witness does not entitle a movant to post-conviction relief[,]" ***Jones v. State***, 696 S.W.3d 450, 466 (Mo. App. E.D. 2024) (quoting ***Harding v. State***, 613 S.W.3d 522, 530 (Mo. App. E.D. 2020)), as we presume that failure to impeach was merely a result of trial strategy. ***Fry v. State***, 244 S.W.3d 284, 287-88 (Mo. App. S.D. 2008). Accordingly, to overcome that presumption, "a movant must demonstrate that the decision was not a matter of reasonable trial strategy and that the impeachment would have provided him with a defense or would have changed the outcome of the trial." ***Tucker v. State***, 468 S.W.3d 468, 474 (Mo. App. E.D. 2015).

In this case, I believe that Movant has overcome the presumption that trial counsel's failure to impeach Sister-in-law was a matter of trial strategy. Trial counsel testified at the evidentiary hearing that he did not have a strategic reason for failing to impeach Sister-in-law with her prior inconsistent statement. The motion court "expressly reject[ed trial counsel's] claims that he had no 'strategy' as an attempt to help [Movant]'s Motion, and those conclusory claims are not credible, or true." The only trial strategy that the motion court credited was

> that the defense had a specific strategy in defending Movant, a strategy that was agreed upon after consulting co-counsel and [Movant]. The strategy was based on the fact that [Nephew] was still in Kansas and had not been very cooperative with the State. Movant's strategy, therefore, was to force the State to go to trial quickly with the hope and expectation the State could not get a cooperative [Nephew] to trial.

However, that strategy failed when Nephew *did* appear at trial and testified in favor of the State.

The fact that the motion court disbelieved trial counsel's testimony that he did not have a strategic reason for failing to impeach Sister-in-law with her prior statement that

10

Movant had come to her house an hour earlier is not evidence that trial counsel *did* have a reasonable trial strategy for failing to do so. Thus, the State's generic claim that failing to impeach Sister-in-law with her prior statement was trial strategy is unpersuasive. *See Wilkes v. State*, 82 S.W.3d 925, 930 (Mo. banc 2002) ("The mere assertion that conduct of trial counsel was 'trial strategy' is not sufficient to preclude a movant from obtaining post-conviction relief based on a claim of ineffective assistance of trial counsel"). Said another way, disbelieving that trial counsel did *not* have a trial strategy cannot create a positive inference that trial counsel *did* have a reasonable trial strategy.

At trial, the State adduced favorable testimony from Sister-in-law, who testified that Movant arrived at her house between 9:00 and 9:30 a.m. and asked to borrow her shovel. Sister-in-law said she remembered the time because that was when she typically got ready for her work shift that began at 10:00 a.m. In light of that testimony favorable to the State already being before the jury, the State has failed to make a cogent argument that trial counsel's failure to confront Sister-in-law with her prior statement to the FBI (provided closer in time to the event) that Movant arrived at her house between 8:00 and 8:30 a.m. was strategic.

"To show prejudice, the movant 'must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Flaherty*, 694 S.W.3d at 422 (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (quoting *Strickland*, 466 U.S. at 694).

The timeline that the State presented at trial was that Nephew and Movant picked Victim up outside the high school at 7:45 a.m. The three then stopped at a gas station for Movant to purchase a drink before driving on the route, after which, according to Nephew,

11

Victim had sex with Nephew, Movant raped Victim, and Movant eventually strangled Victim to death.  Movant and Nephew then traveled to Nephew's mother's trailer with the body before Movant then went by himself to Sister-in-law's home.

On behalf of the State, Detective testified that the driving time alone – without taking into account the other actions that Nephew claimed the three engaged in (and Victim's running away at one point) – would have taken at least one hour and twenty minutes.  In light of that evidence, the jury could reasonably have found that it would have been impossible for Movant to have arrived at Sister-in-law's residence before 8:55 a.m.  It is undisputed that Sister-in-law told the FBI agent in 2007 that Movant arrived well before 8:55 a.m., somewhere between 8:00 and 8:30 a.m. – a critical fact that trial counsel did not attempt to prove at Movant's trial.

Further, Sister-in-law's statement to the FBI agent that she and Movant were waiting for the bank to open at 9:00 a.m. strongly supports Movant's arrival having been between 8:00 a.m. and 8:30 a.m., as opposed to the later arrival time that Sister-in-law testified to at trial.  If Movant arrived after 9:00 a.m. – the timeline asserted by the State – there would have been no need for Sister-in-law and Movant to discuss waiting for the bank to open at 9:00 a.m.  The significance of the television show having aired at both 8:30 and 9:30 a.m. is not compelling as it does not prove or disprove either timeline.  If Sister-in-law had been asked about her prior statement, and the jury believed it was likely more reliable than her contrary testimony at trial years later, that fact would have made the State's timeline an impossibility.

Thus, there is a reasonable probability that the outcome at trial would have been different if the jury had heard about Sister-in-law's prior inconsistent statement that strongly negated the State's proffered timeline and directly challenged the credibility of

Nephew's story. That is especially true in a case like this one, in which Victim's body was never found and the case relied largely upon Nephew's testimony. Accordingly, a reasonably competent attorney would have impeached Sister-in-law's trial testimony that Movant arrived around 9:00 or 9:30 a.m. with her prior inconsistent statement that Movant arrived between 8:00 and 8:30 a.m.

*Point 3*[6]

Movant's third point alleges:

> The motion court clearly erred in denying [Movant]'s claim his attorney was ineffective for failing to impeach [Nephew] with the evidence that he was not in Eldon on May 16, 1984, because [Movant] received [IAC] . . . in that: (1) his trial counsel failed to act as [a] reasonably competent attorney would under the same or similar circumstances when he failed to impeach [Nephew] with his school records and police reports, which indicated he was likely in Wichita on May 16, 1984; and (2) there is a reasonable probability the outcome of the trial would have been different because the State's case was weak and relied almost entirely on [Nephew]'s credibility, and this testimony would have raised doubt in the juror's minds [sic] about the State's timeline and [Nephew]'s credibility.

I agree with this point as well.

The school records from Eldon indicated that Nephew and his brother were enrolled in school in Eldon in December 1983. In February 1984, Nephew's grandmother filed a missing-persons report with the Eldon Police department that claimed Nephew, Nephew's brother, and their mother were all missing. On March 10, 1984, police records revealed that Nephew was in Wichita, Kansas, staying with another set of grandparents, and he was no longer in Eldon. On March 8, 1984, school records regarding Nephew and his brother were transferred from Eldon schools to a junior high school in Wichita. The Wichita school system's records indicate that Nephew was enrolled in Wichita schools from March 15, 1984, to September 10, 1984, a timeframe that includes the day that

---

[6] I concur in the analysis and resolution of Point 2 for the reasons set forth in the principal opinion.

Victim disappeared. Those records also indicated that Nephew took a standardized test at the Wichita school in April 1984.

Those school records offer a reasonable basis upon which the jury could find that Nephew was not living in Eldon on the day that Victim disappeared, making it less likely that Nephew was in a car at 7:45 a.m. at Eldon High School on the day that Victim disappeared, instead of being at his own school in Wichita on a school day. And although Nephew testified at trial that he was in Eldon on the day in question, he had written letters to family while incarcerated in 2010 that said he was *not* in Eldon in May 1984.

"[T]he question is not whether the error would likely have produced a different result, but whether defendant suffered a genuine deprivation of his right to effective assistance of counsel in which the Court's 'confidence in the fairness of the proceeding is undermined.'" *Hannon v. State*, 491 S.W.3d 234, 247 (Mo. App. E.D. 2016) (quoting *Deck v. State*, 68 S.W.3d 418, 428 (Mo. banc 2002)).

Given that trial counsel was aware of the existence of (1) Sister-in-law's prior statement to Agent Bryant that Movant arrived at her home an hour earlier than she stated at trial, and (2) the Eldon and Wichita school records indicated that Nephew could be presumed to have been in Wichita on the day of Victim's disappearance, my confidence in the fairness of Movant's trial has been undermined, and I conclude that the motion court clearly erred in denying Movant's amended Rule 29.15 motion. I would grant points 1 and 3, vacate the motion court's denial of postconviction relief, and remand the case for a new trial.

DON E. BURRELL, J. – DISSENTING OPINION AUTHOR

14